DAVID J. HACKER, CA Bar No. 249272
ALLIANCE DEFENDING FREEDOM
101 Parkshore Dr., Suite 100
Folsom, California 95630
(916) 932-2850
(916) 932-2851 Fax
dhacker@ADFlegal.org

TYSON C. LANGHOFER, AZ Bar No. 32589*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0021 Fax
tlanghofer@ADFlegal.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **YOUNG AMERICA'S FOUNDATION**; **CSULA YOUNG AMERICANS FOR FREEDOM**, a registered student organization at California State University-Los Angeles; **BEN SHAPIRO;** and **MARK KAHANDING**, <br><br> Plaintiffs, <br><br> v. <br><br> **WILLIAM COVINO**, President of California State University-Los Angeles, in his official and individual capacities; **NANCY WADA-MCKEE**, Vice President for Student Life of California State University-Los Angeles, in her official and individual capacities; **LISA CHAVEZ**, Vice President for Administration and Chief | Case No. 2:16-cv-03474 <br><br> **DEMAND FOR JURY TRIAL** <br><br> **VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, MONETARY DAMAGES, AND ATTORNEYS' FEES AND COSTS** |

Financial Officer of California State University-Los Angeles, in her official and individual capacities; **JON ORTIZ**, Director of Operations for the University Student Union of California State University-Los Angeles, in his official and individual capacities; **MELINA ABDULLAH**, Assistant Professor at California State University-Los Angeles, in her official and individual capacities; **LUZ BORJAN MONTALVO**, Coordinator of Undocumented Students Program at California State University-Los Angeles, in her official and individual capacities; **ROBERT WEIDE**, Assistant Professor at California State University-Los Angeles, in his official and individual capacities; and **TALIA MAE BETTCHER**, Professor and Chair of Philosophy Department at California State University-Los Angeles, in her official and individual capacities,

    Defendants.

Plaintiffs Young America's Foundation, CSULA Young Americans for Freedom, Ben Shapiro, and Mark Kahanding by and through counsel, and for their Verified Complaint against the Defendants, hereby state as follows:

1.    The cornerstone of higher education is the ability of students to participate in the "marketplace of ideas" on campus. That marketplace depends on free and vigorous debate between students, and the ability to offer diverse and competing views on current and age-old topics.

2.     This case arises from policies and practices of California State University-Los Angeles ("CSU-LA" or the "University") and public officials employed by the University that restrict the expressive rights of students and student organizations.

3.     Although CSU-LA's free expression policy states that "exposure to the widest possible range of ideas, viewpoints, opinions, and creative expression is an integral and indispensable part of a University education," it uses its policies to censor, restrict, and inhibit unpopular student speech thus unconstitutionally infringing upon students' First Amendment and Fourteenth Amendment rights.

4.     The University uses its Security Fees Policy to restrict student speech by requiring students to pay for security if they wish to engage in protected speech that the University deems "controversial."

5.     The Security Fees Policy chills protected student speech and disables the ability of students to engage in debates about important political, cultural, moral and religious topics.

6.     CSU-LA enforces other policies and procedures in a discriminatory manner, which encourages and facilitates the University community in harassing, suppressing and shutting down unpopular speech.

7.     When Plaintiff CSULA Young Americans for Freedom ("YAF"), a registered student organization at the University, submitted a request to bring Plaintiff Ben Shapiro ("Shapiro") to campus to speak, the University approved the request, but required YAF to pay over $600 for security for the event because the University arbitrarily classified Shapiro's speech as "controversial."

8.     When YAF objected to the security fees, the University relented and agreed not to impose them.

9.     Instead, just three days prior to the scheduled event, the President of CSU-LA, Defendant William Covino, sent an e-mail to YAF canceling the event because it would be "best for our campus community" but stating that he would

schedule a "more inclusive event" where Shapiro could speak "as part of a group of speakers with differing viewpoints on diversity."

10.     YAF refused to agree to the unconstitutional censorship by Defendant Covino and instead chose to proceed with the event as originally approved and scheduled.

11.     On the day of the event, Defendant Covino allowed YAF's event to occur, but hundreds of protestors flooded the University's Student Union and physically blocked access to the theater in which Shapiro was scheduled to speak.

12.     Numerous professors and faculty of the University assisted with organizing the protest, encouraged their students to attend the protest, participated in physically blocking the doors to the theater, and encouraged students to do the same.  Defendants Melina Abdullah, Luz Borjan Montalvo, Robert Donald Weide, and Talia Mae Bettcher were among those professors involved.

13.     As a result of the protests, many students were unable to attend and participate in the speaking event, and Shapiro was forced to speak to a half-empty theater.

14.     By blocking ingress and egress to the theater, the protestors violated numerous University policies and state and local laws and created a serious safety hazard for those both inside and outside the theater.

15.     Due to the Defendants' disagreement with the content and viewpoint of Plaintiffs' speech, the Defendants refused to enforce the University policies and state and local laws and allowed the protestors to engage in an unlawful assembly and to block ingress and egress to the theater.

16.     This action is premised on the United States Constitution and concerns the denial of Plaintiffs' fundamental rights to free speech, due process, and equal protection of law.

17.     Defendants' policies and practices have deprived and will continue to deprive Plaintiffs' of their paramount rights and guarantees under the United States Constitution.

18.     Each and every act of Defendants alleged herein was committed by such Defendants, each and every one of them, under the color of state law and authority.

## JURISDICTION AND VENUE

19.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

20.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

21.     This Court has supplemental jurisdiction over the state law claims made herein pursuant to 28 U.S.C. § 1367.

22.     This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343 and Cal. Civ. Code § 52.1(b); the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-02 and Cal. Civ. Code § 52.1(b); the requested injunctive relief pursuant to 28 U.S.C. § 1343, Cal. Civ. Code § 52.1(b), and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(h).

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this district and all of the acts described in this Complaint occurred in this district.

## PLAINTIFFS

24.     Plaintiff Young America's Foundation (the "Foundation") is a nonprofit organization, incorporated in the State of Tennessee, whose mission is to educate the public on the ideas of individual freedom, a strong national defense, free enterprise, traditional values, and leadership.

25.     Plaintiff CSULA Young Americans for Freedom ("YAF") is an expressive, recognized student organization at the University.  YAF is an affiliated chapter of Young America's Foundation, a national, non-partisan organization with chapters at public and private universities throughout the country.  YAF's purpose is to bring students together to advocate for the ideas of limited government, individual freedom, free enterprise, traditional values, and a strong national defense.

26.     YAF is a project of the Foundation, thus, all student YAF chapters, like Plaintiff YAF in this lawsuit, are affiliates of the Foundation.

27.     YAF desires to express its message on the University campus through a variety of means including flyers, signs, peaceful demonstrations, hosting tables with information, inviting speakers to campus, and talking with fellow students about individual freedom, free markets, and limited government, among other things.

28.     When engaging in these expressive activities, YAF and its members discuss political, religious, social, cultural, and moral issues and ideas.

29.     Plaintiff Ben Shapiro ("Shapiro"), is a resident of North Hollywood, California, and is an American political commentator, nationally syndicated columnist, author, radio talk show host, and attorney.

30.     Plaintiff Mark Kahanding is a resident of Glendale, California, a student at the University, and is the President and founder of YAF.

**DEFENDANTS**

31.     Defendant William Covino ("Covino") is, and was at all times relevant to this Complaint, the President of California State University-Los Angeles, a public university organized and existing under the laws of the State of California.

4

32.    The California State University Board of Trustees has designated the University President as the chief executive officer and administrative head of CSU-LA.

33.    Defendant Covino is responsible for enactment, implementation and enforcement of University policies and their application to student speech.

34.    Defendant Covino is responsible for enactment, implementation, and enforcement of the Security Fee Policy, the Public Demonstrations Policy, and the Free Expression Policy by University employees.

35.    Defendant Covino is aware of the Security Fee Policy, and has the authority to change the policy, but he did not modify the policy.

36.    Defendant Covino cancelled Shapiro's speech, reinstated it, and then ordered University police not to move protestors away from the theater doors, which prevented students and the public from attending the speech.

37.    Defendant Covino is sued in his official and individual capacities.

38.    Defendant Nancy Wada-McKee ("Wada-McKee") is, and was at all times relevant to this Complaint, the Vice President for Student Life at California State University-Los Angeles, a public university organized and existing under the laws of the State of California.

39.    Defendant Wada-McKee, in consultation with Defendant Covino, is responsible for the administration, interpretation, and oversight of certain University policies, including the Public Demonstrations Policy and the Free Expression Policy, and their application to student speech.

40.    Defendant Wada-McKee possesses the authority to enforce the Public Demonstrations Policy and Free Expression Policy to ensure that all participants are conforming to California state laws and University policies.

41.    Defendant Wada-McKee ordered University police not to move protestors away from the theater doors, and refused to enforce other University policies which prevented students and the public from attending the speech.

42.     Defendant Wada-McKee is sued in her official and individual capacities.

43.     Defendant Lisa Chavez ("Chavez") is, and was at all times relevant to this Complaint, the Vice President for Administration and Chief Financial Officer of California State University-Los Angeles, a public university organized and existing under the laws of the State of California.

44.     Defendant Chavez, in consultation with Defendants Covino and Wada-McKee, is responsible for the administration, interpretation, and oversight of certain University policies, including the Facilities Use Policy, and their application to student speech.

45.     Defendant Chavez ordered University police not to move protestors away from the theater doors, and refused to enforce other University policies which prevented students and the public from attending the speech.

46.     Defendant Chavez is sued in her official and individual capacities.

47.     Defendant Jon Ortiz ("Ortiz") is, and was at all times relevant to this Complaint, the Director of Operations of the University Student Union at California State University-Los Angeles, a public university organized and existing under the laws of the State of California.

48.     Defendant Ortiz possesses the authority to require student groups to pay the University for security costs incurred as a result of events hosted by the student group at the University Student Union.

49.     Defendant Ortiz required YAF to pay the University to provide security for Shapiro's speech because he deemed Shapiro's speech to be controversial.

50.     Defendant Ortiz is sued in his official and individual capacities.

51.     Defendant Melina Abdullah is, and was at all times relevant to this Complaint, an Assistant Professor of Pan African Studies at the University.

52.     Defendant Abdullah, by her own actions and organizing the actions of others, physically prevented students from attending Shapiro's speech and prevented YAF, the Foundation, Kahanding, and Shapiro from communicating their message to all interested listeners.

53.     Defendant Abdullah is sued in her official and individual capacities.

54.     Defendant Robert Weide is, and was at all times relevant to this Complaint, an Assistant Professor in the Sociology department at the University.

55.     Defendant Weide, by his own actions and organizing the actions of others, tore down the Foundation's and YAF's posters, physically prevented students from attending Shapiro's speech, and prevented YAF, the Foundation, Kahanding, and Shapiro from communicating their message to all interested listeners.

56.     Defendant Weide is sued in his official and individual capacities.

57.     Defendant Luz Borjon Montalvo ("Montalvo") is, and was at all times relevant to this Complaint, the Coordinator of Undocumented Students at the University.

58.     Defendant Montalvo, by her own actions and organizing the actions of others, physically prevented students from attending Shapiro's speech and prevented YAF, the Foundation, Kahanding, and Shapiro from communicating their message to all interested listeners.

59.     Defendant Montalvo is sued in her official and individual capacities.

60.     Defendant Talia Mae Bettcher ("Bettcher") is, and was at all times relevant to this Complaint, a Professor and Chair of the Philosophy Department at the University.

61.     Defendant Bettcher, by her own actions and organizing the actions of others, physically prevented students from attending Shapiro's speech and prevented YAF, the Foundation, Kahanding, and Shapiro from communicating their message to all interested listeners.

7

62.     Defendant Bettcher is sued in her official and individual capacities.

**FACTUAL BACKGROUND**

63.     CSU-LA is a public university created by the State of California and located in Los Angeles, California.

64.     The trustees of the California State University System have delegated power to Defendant Covino to act as the administrative head of CSU-LA.

65.     California Education Code § 89035 authorizes the trustees of the California State University System to "adopt a rule delegating . . . power to any officer, employee, or committee as the trustees may designate."

66.     Defendant Covino is responsible for the enactment, implementation, and enforcement of CSU-LA policies affecting students, student organizations, faculty, and guests.

67.     The California Code of Regulations, 5 Cal. Code Regs. § 42402, provides that the "president of each campus is responsible for the educational effectiveness, academic excellence, and general welfare of the campus over which he presides."

68.     CSU-LA sets forth its policies and procedures through an Administrative Procedures Manual.

69.     CSU-LA Administrative Procedure 001 § 6.0 states that the responsibilities of Defendant Covino include to "review, approve and sign Administrative Procedures after final review," and "implement new procedures or revisions to existing procedures on an interim basis until the formal review process is completed if determined to be in the best interests of the University."

**University Defendants' Security Fees Policy**

70.     CSU-LA governs the use of its facilities and equipment through Administrative Procedure 505 (the "Facilities Use Policy").  A copy of the policy is attached as Exhibit 1 to this Complaint.

71.     Defendant Covino is responsible for enactment, enforcement, and implementation of the Facilities Use Policy, including enforcement and application against Plaintiffs.

72.     Defendant Chavez possesses "final responsibility in authorizing or denying the use of facilities by off-campus groups, and assessment of charges as appropriate," Ex. 1 at § 6.2.3, including enforcement and application against Plaintiffs.

73.     The Facilities Use Policy establishes the guidelines for determining the necessity for and level of security that may be required for any proposed event on campus.

74.     Defendants Covino, Wada-McKee, Chavez, and Ortiz (sometimes collectively referred to herein as the "University Defendants") are each delegated specific authority and responsibility for the administration, interpretation, and oversight of the Facilities Use Policy, *Id*., including enforcement and application against Plaintiffs.

75.     The stated purpose of the Facilities Use Policy is to "establish the policies and procedures governing the use of University facilities, equipment, and services." *Id*.

76.     The Facilities Use Policy provides that University facilities may be used for "[a]ctivities not directly related to the academic program, but sponsored by University recognized organizations and intended primarily for a campus audience."  However, the "[t]ime, place, and manner of non-instructional events and activities shall be determined by the University in accordance with relevant statutes, policies, and procedures." *Id* at § 4.1.

77.     The Office of Public Affairs is required to "[r]eview requests for use of University facilities for non-instructional activities to determine suitability of the space requested and conformity of the proposed event with University policy." *Id* at § 6.3.2.

78.    The Department of Public Safety is required to "[p]rovide security, parking, and/or crowd control as needed upon receipt of Public Safety Work Request Form."  The Department of Public Safety is further required to "[p]erform a risk assessment of each event to determine appropriate staffing levels and assign personnel as required."  *Id* at § 6.6.

79.    In conducting the risk assessment, the Facilities Use Policy requires the Department of Public Safety to "take into account the type of event, profile of attendees, historical, or any other relevant considerations."  *Id.*

80.    The Facilities Use Policy establishes general staffing guidelines for various types of events.   For any event that the University classifies as "controversial activity," the Policy requires a range of: (1) at least 3 to all Police Officers; (2) zero to two Parking Officers; and (3) two to five Student Assistants. *Id.*

81.    Appendix 8.1 to the Facilities Use Policy is entitled "Rates and Charges Schedule for University Facilities, Equipment and Services (Subject to Change)."   However, the Schedule does not include the rates and charges for security.  A copy of the Rates and Charges Schedule is attached as Exhibit 2 to the Complaint.

82.    The Student Organization Handbook contains a section entitled "Security at Campus Events" (the "Security at Campus Events Policy") (the Facilities Use Policy and Security at Campus Events Policy are sometimes collectively referred to hereafter as the "Security Fees Policy").   This policy provides that "Student Organizations may request the Department of Public Safety to provide security at their on campus events."   If a request is made, the Department "will provide services for a fee."   A copy of the Security at Campus Events Policy is attached as Exhibit 3 to the Complaint.

83.     If a Student Organization expects attendance at its event to exceed seventy-five people, the organization "must notify the Department of Public Safety in order to determine security needs prior to the event, if any." *Id.*

84.     The estimated security fees are: (1) University Police Officers - $85 per hour, per officer; (2) Peer Officers - $11 per hour, per officer; (3) Parking Officers - $45 per hour, per officer; and (4) Administration Fee – 7.5% of total security fees or $50 (whichever is greater).  *Id.*

85.     The Security Fees Policy, by specifying a particular fee for "controversial" events, allows the University to discriminate against Plaintiffs and other students at the University based upon the content and viewpoint of their speech.

86.     The Security Fees Policy requires the University Defendants to consider the content and viewpoint being expressed by a student or student organization to determine whether to impose security fees upon the student or student organization.

87.     The Security Fees Policy authorizes University Defendants to impose security fees upon YAF and other student organizations if the University Defendants determine that the event is going to involve "controversial activity."

88.     The Security Fees Policy does not provide any objective, non-content-based and non-viewpoint-based criteria for University Defendants to use when deciding whether to impose security fees on YAF and other student organizations.

89.     The Security Fees Policy does not limit the discretion of University Defendants when deciding whether to impose security fees upon YAF and other student organizations.

90.     Students or student organizations, including YAF, that fail to pay the security fees imposed by University Defendants will be unable to conduct their event on campus.

**University Defendants' Public Meetings Policy**

91.   CSU-LA regulates public meetings and demonstrations through Administrative Procedure 404 (the "Public Meetings Policy").   A copy of the Public Meetings Policy is attached as Exhibit 4 to this Complaint.

92.   The purpose of the policy is to "establish the procedures for the observation and control of public meetings, rallies, and demonstrations held on campus."  *Id.* at § 1.0.

93.   Each of the University Defendants is delegated specific authority and responsibility for the administration, interpretation, and oversight of the Public Meetings Policy.  *Id.*

94.   An unlawful assembly is defined as "two or more persons assembled together to do an unlawful act, or to do a lawful act in a violent, boisterous, or tumultuous manner."  *Id.* at § 5.1.  This definition is consistent with the definition of an unlawful assembly as defined by the California Penal Code § 407.

95.   All employees of the University are required to "[r]eport instances of apparent unlawful assembly, demonstrations, or disturbances to which they may have prior knowledge of, or are a witness to, to the Department of Public Safety (University Police)."  *Id.* at § 6.1.1.

96.   Defendant Wada-McKee, as the Vice President for Student Affairs, is required to: (1) "[a]ssess planned and spontaneous activities during a demonstration or rally to ensure that participants are conforming to State law and University policy;" and (2) "[i]n the event that activities or individuals are violating State law or University policy, in consultation with the Directors of Public Safety and Public Affairs, determine the actions necessary to restore the peace."  *Id.* at § 6.6.3.

97.   Defendant Wada-McKee is required to "notify the Office of the President of the status of the situation and, in consultation with the Director of

1  Public Safety, the executive officers and other appropriate administrators,
2  determine the University response to the incident." *Id.* at § 7.5.

3      98.    Defendants Covino and Wada-McKee work together to enforce the
4  Public Meetings Policy.

5      99.    Ultimately, Defendant Covino is responsible for enactment,
6  enforcement, and implementation of the Public Meetings Policy.

7                    **University Defendants' Free Expression Policy**

8      100.  CSU-LA regulates students' expression on campus through
9  Administrative Policy P007 (the "Free Expression Policy").  A copy of the Free
10  Expression Policy is attached as Exhibit 5 to this Complaint.

11      101.  Defendant Covino is responsible for enactment, enforcement, and
12  implementation of the Free Expression Policy.

13      102.  Defendant Wada-McKee is responsible for the enforcement of the
14  Free Expression Policy.

15      103.  According to the Free Expression Policy, the University believes that
16  "[e]xposure to the widest possible range of ideas, viewpoints, opinions and creative
17  expression is an integral and indispensable part of a University education for life in
18  a diverse global society." *Id.*

19      104.  The Free Expression Policy is designed to establish "reasonable, non-
20  discriminatory, content-neutral guidelines and procedures" that "protect the rights
21  of speakers and non-speakers, respect the rights of faculty and staff in the
22  classrooms, ensure fair access and due process for those who wish to use the
23  University's public forums, and maintain a safe environment on the University
24  campus." *Id.*

25      105.  Students and student organizations are allowed to "exercise all forms
26  of expression and free speech … provided that such activities do not … infringe
27  upon the rights of others." *Id.*

28

106.   The Free Expression Policy contains a list of prohibited activities, including:

(a)   Persons may not block or otherwise interfere with the reasonable free flow of vehicular, bicycle pedestrian traffic. The right of way on streets and sidewalks must be maintained.

(b)   Persons may not block or otherwise interfere with reasonable ingress and egress into and out of campus buildings, or interfere with any use of property belonging to the University, or to other persons, which is legal and authorized by the owner of the property.

(c)   Persons shall not significantly or materially disrupt any event or activity sponsored by the University or by any users authorized to use University facilities.

(d)   The safety and well-being of the campus community must be protected at all times.  Persons shall not engage in physically abusive conduct toward any person or property nor present a credible threat of physical harm, or an objectivity [*sic*] demonstrable risk of suffering physical harm.

(e)   When an event is being held in a University building or a facility, persons may demonstrate and/or leaflet in accordance with the procedures set forth in this policy.  Signs, placards, or similar paraphernalia associated with a demonstration may not be carried into the building or facility.  Members of the campus community and outside guests shall have the right to peacefully protest any speaker, meeting, or event, so long as the event being protested is not significantly or materially disrupted.

*Id.*

107. The Free Expression Policy allows unscheduled events and demonstrations, provided that such events comply with certain regulations, including:

(a)    Unscheduled events or demonstrations may be held in public forum areas, without reservations, as long as they do not violate University policies or procedures or federal, state, or other applicable law.

(b)    It is inappropriate for events and demonstrations that have been planned to circumvent the policies by claiming to be spontaneous.  In deciding whether an event or demonstration is spontaneous or planned, the University may consider any relevant evidence, including (a) whether signs or placards used at the demonstration were commercially produced, (b) whether participants used amplified equipment, (c) whether security was altered, or media contacted, substantially in advance of the demonstration, or (d) whether other circumstances demonstrate advance planning by one or more individuals and/or organizations.

(c)    In the event of multiple groups or individuals attempting to use the public forum areas at the same time and place, priority shall be given in the following order: (1) to previously scheduled events and demonstrations (including but not limited to University-arranged entertainment taking place on the stage northeast of the University-Student Union); (2) to events and demonstrations conducted by recognized University organizations, students, student organizations, and current employees; and (3) on a first-come, first-serve basis.

*Id.*

**University Defendants' Application of the Unconstitutional Security Fees Policy to YAF's Freedom of Speech**

108.   In January 2016, the Foundation partnered with Shapiro to host a nationwide speaking tour at college campuses to discuss free speech in higher education.

109.   YAF contacted the Foundation and requested that CSU-LA be included as a stop on Shapiro's speaking tour.

110.   The Foundation and Shapiro agreed to include CSU-LA in the speaking tour.

111.   The event was entitled "When Diversity Becomes a Problem" and was tentatively scheduled for February 25, 2016 at 2:00 p.m. (the "Free Speech Event").

112.   YAF filled out an Event Registration Form and submitted it to the Center for Student Involvement.

113.   The event form was approved by the University and returned to YAF.

114.   YAF submitted a request to reserve the University Student Union Theatre.  The request was approved by the University.

115.   YAF submitted a request to the Association of Students, Inc. ("ASI") to fund a portion of the event.

116.   ASI approved YAF's request to fund the Free Speech Event in the amount of $560.

117.   In consideration for bringing Shapiro to CSU-LA, YAF agreed to pay this entire amount to the Foundation to cover a small portion of the Foundation's cost in hosting the lecture series.

118.   The Foundation incurred a total of $18,367.93 in expenses to host the Free Speech Event, less the $560 reimbursement from YAF.

119.   Upon receiving ASI's funding approval, YAF created an event on Facebook and began promoting the Free Speech Event on its Facebook page.

120.   Students and faculty, including Defendant Weide, began posting angry and threatening comments on YAF's Facebook page.  A copy of some of the comments are attached as Exhibit 6 to this Complaint.

121.   On February 18, 2016, the University issued a Public Safety Work Request requiring YAF to pay the University $621.50 to provide security for the Free Speech Event.  A copy of Public Safety Work Request (the "Work Request") is attached as Exhibit 7 to this Complaint.

122.   The Work Request was prepared by Defendant Ortiz.  According to the Work Request, the Free Speech Event was scheduled from 2:00 P.M. to 4:00 P.M. and attendance was estimated to be 200 people.

123.   The Work Request included the following description of the event:

> Student organization Young Americans for Freedom will be hosting guest speaker Ben Shapiro.  Mr. Shapiro's topics and views are controversial therefore University Police will be assigned to this event.  Ben Shapiro will have his own security detail as well that must be sanctioned by the Chief of Police. Doors open at 1:30 PM and event starts at 2 PM.

*Id.*

124.   The Work Request requested nine University Police officers and three Student Assistants for a period of 4.5 hours to provide security for the Free Speech Event.   The description of the job was as follows: "Several University Police Officer [*sic*] will be utilized for this event.  3 Eagle Patrol personnel will be needed to mitigate the line and assist University Police.  Student organization will only be charged for 1 Police personnel." *Id.*

125.   The Work Request indicated that YAF would be charged a total of $621.50 which was itemized as follows: (1) 1 University Police Officer for 4.5

hours for a total of $382.50; (2) 3 Student Assistants for 4.5 hours for a total of $189.00; and (3) a $50 fee for Planning/Processing. *Id.*

126.   The University Defendants imposed the security fees upon YAF based on student and faculty reactions to the proposed Free Speech Event and the content and viewpoints that YAF intended to present during the event.

127.   On February 22, 2016, after YAF learned that the University was attempting to charge YAF a fee due to the alleged "controversial" nature of Shapiro's speech, YAF's counsel sent a letter to the University demanding that the University rescind the unconstitutional assessment of security fees on YAF.   A copy of the letter is attached as Exhibit 8 to the Complaint.

128.   On February 23, 2016, the University agreed to rescind the assessment of security fees on YAF because it said there was not enough time to research whether the charge was proper.   A copy of the e-mail is attached as Exhibit 9 to the Complaint.

129.   Although the University agreed to rescind the assessment of security fees for the Free Speech Event, the University still maintains the Security Fees Policy.

130.   YAF is already planning several activities for the fall 2016 semester. The University will likely consider these activities to be "controversial."

131.   YAF fears that if it submits a reservation request to use CSU-LA facilities for any of these events, Defendants will impose security fees based on the "controversial" nature of the speech.

132.   YAF cannot afford to pay security fees for these upcoming events.

133.   CSU-LA's Security Fees Policy and University Defendants' potential enforcement of such policy against YAF burdens its freedom of speech.

### Defendants' Violation of Plaintiffs' Freedom of Speech

134.   On February 22, 2016, Defendant Covino cancelled the Free Speech Event because of the public reaction to his proposed speech.

135.   Defendant Covino sent the following e-mail to Mark Kahanding, President of YAF, stating that the University was canceling the Free Speech Event:

> After careful consideration, I have decided that it will be best for our campus community if we reschedule Ben Shapiro's appearance for a later date, so that we can arrange for him to appear as part of a group of speakers with differing viewpoints on diversity.  Such an event will better represent our university's dedication to the free exchange of ideas and the value of considering multiple viewpoints.  We will be happy to work with Mr. Shapiro to schedule the more inclusive event that I have in mind.  I have informed the university staff involved in facilitating the February 25 event that it will be rescheduled and reconfigured for a later date.

A copy of the e-mail is attached as Exhibit 10 to the Complaint.

136.   YAF, the Foundation, and Shapiro decided that they would not consent to reschedule the Free Speech Event and they announced that they planned to proceed with the event as scheduled.

137.   When it became clear that YAF, the Foundation, and Shapiro were going to proceed with the Free Speech Event in spite of Defendant Covino's unlawful attempts to shut it down, Defendant Covino issued the following press release just hours before the start of the event:

> Author Ben Shapiro was invited to speak this afternoon at Cal State LA by the Young Americans for Freedom, which is a registered student organization. The event, "When Diversity Becomes a Problem," was funded by the Associated Students, Inc., the student government.

Leading up to the event, there were a number of emails and social media posts that caused concern for the campus community.  Given threats and expressions of fear, President William A. Covino proposed a rescheduled event that would be civil and inclusive, and in which Mr. Shapiro and speakers with other viewpoints could offer their perspectives in an organized forum.

"My decision was made in the interest of safety and security," Covino said. "I am disappointed that Mr. Shapiro has not accepted my invitation to speak in such a forum.  He has indicated that he will come to Cal State LA to speak today at the University-Student Union Theatre, where he was originally scheduled to deliver his talk," Covino told the University community Thursday morning.

Covino added: "I strongly disagree with Mr. Shapiro's views.  But if Mr. Shapiro does appear, the University will allow him to speak.  We will make every effort to ensure a climate of safety and security."

A copy of the press release is attached as Exhibit 11 to the Complaint.

138.  Despite Defendant Covino's assurances, the Defendants made virtually no effort to ensure a climate of safety and security.

139.  Plaintiff Mark Kahanding ("Kahanding"), President of YAF, and Amy Lutz ("Lutz"), Program Officer for the Foundation, arrived on campus around 7:00 a.m. on the day of the Free Speech Event.  On their arrival, they noticed several protestors with sleeping bags camped out in front of the doors to the Student Union.

140.  Kahanding and Lutz began posting flyers around the campus to promote the event.  As Kahanding and Lutz began posting flyers, they observed

that the campus had already been blanketed with flyers urging students to participate in a "Power to the People Unity Rally" and "Take-Over" the Student Union to prevent Shapiro from being able to deliver his speech.  The rally was scheduled to begin at 1:00 p.m. which is a half hour prior to the time the doors were going to open for Shapiro's speech.

141.   After posting flyers, Kahanding, Lutz, and other members of YAF began preparing for the Free Speech Event.  Between 10:00 a.m. and 11:00 a.m., Kahanding noticed that there were a large number of protestors gathering both inside and outside the Student Union.

142.   Due to the large and aggressive group of protestors, Lutz and Kahanding became concerned that students wishing to attend the Free Speech Event would have a difficult time getting in the doors to hear Shapiro's speech and participate in the event.

143.   Approximately two hours prior to the beginning of the Free Speech Event, the protestors began filling the lobby of the Student Union.  The protestors eventually linked arms in front of the doors and physically blocked access to the doors to the theater where the event was to be held.  Pictures of the protestors are attached as Exhibit 12 to the Complaint.

144.   Students wishing to attend the Free Speech Event were lined up outside the Student Union and were attempting to enter the theater.  However, they were unable to access the Free Speech Event due to the protestors.

145.   Many University police officers were present at the Student Union at the time the protestors began blocking access to the doors.

146.   The University police officers did not take any action to stop the protestors from blocking access to the Free Speech Event or to otherwise assist interested individuals in gaining access to the event.

147.   Upon information and belief, Defendants Covino and Wada-McKee instructed University Police Chief Rick Wall to not move the protestors away from the Free Speech Event.

148.   When YAF members realized that students were unable to access the Free Speech Event through the front entrance in the lobby of the Student Union and that the University police were not going to take any action to ensure access to the event, YAF began searching for alternative ways to assist students in gaining access to the event.

149.   YAF learned that there was a back door to the Student Union which allowed access to the theater.

150.   YAF members began discreetly informing students and escorting them to the back entrance.  However, the protestors soon learned that students were using the back door to gain entrance to the Free Speech Event.  Many protestors then moved to the back entrance, stood in front of the door, and blocked access to the back doors of the Student Union.  Pictures of the protestors are attached as Exhibit 13 to the Complaint.

151.   The University police officers, pursuant to the orders of Defendants Covino and Wada-McKee, did not take any action to stop the protestors from blocking the back doors of the Student Union.

152.   At this point, the protestors were blocking access to the only two entrances to the theater where the Free Speech Event was to be held.  No one was able to get into or out of the theater.

153.   The theater has a capacity of 200 and it was approximately half-full at the time the entrances to both doors were blocked by the protestors.

154.   The theater would have been filled to capacity and students and others would have been able to attend the Free Speech Event if Defendants would have fulfilled their duties to allow unrestricted access to the theater.

155.   More than 100 students and community members were outside wanting to attend the Free Speech Event but were unable to do so because the protestors were blocking access to the doors.

156.   Shapiro was scheduled to begin his speech at 2:00.  As a result of the protestors blocking access to the Free Speech Event, YAF, the Foundation and Shapiro delayed the start of the speech in an effort to allow more students to attend the event.

157.   The beginning of the Free Speech Event was delayed for approximately ten to fifteen minutes.  Even though the theater was only half-full, Shapiro decided to proceed with his speech because it became clear that the Defendants were not going to take any action to enforce University policies and remove the protestors who were blocking access to the Theatre.

158.   During Shapiro's speech, one of the protestors pulled the fire alarm in the Student Union in an attempt to further disrupt and interfere with his speech. Shapiro was forced to shout over the fire alarm for approximately two minutes so that he could convey his message to the listeners.

159.   Upon the conclusion of his speech, the University police officers advised Shapiro that the students should not attempt to leave the theater because the crowds were blocking both exits and the protestors may cause harm to the attendees.

160.   The students voiced their desire to leave the theater but the University police advised that the students' lives would be in danger if they left the theater and that they could not guarantee the students' safety.

161.   The safety of the students and other attendees would not have been threatened if the University police officers had moved the protestors away from the front and rear entrances to the theater, but Defendants Covino and Wada-McKee had ordered them not to do so.

162.   The University police then escorted Shapiro through a secret exit while all of the attendees were forced to remain in the theater.

163.   Due to the protestors blocking both exits and the University's unwillingness to remove them, the attendees, including Kahanding, were unlawfully forced to remain in the theater against their will for approximately 15 to 20 minutes after the Free Speech Event ended.

164.   By blocking access to the doors, the protestors were engaged in an unlawful assembly pursuant to California Penal Code § 407 and the Free Expression Policy.   Additionally, the protestors were violating numerous other University policies, including specific provisions of the Free Expression Policy which prohibits blocking access to University buildings and materially disrupting campus events.

165.   The City of Los Angeles Fire Code § 1004.7 provides that "[n]o manager or person in control of any assembly occupancy or premises shall allow an overcrowded condition to exist in that assembly occupancy or premises."

166.   The City of Los Angeles Fire Code § 1004.8 provides that "[n]o manager or person in control shall allow the use of any room, building or premises without providing the exits required by this article."

167.   The Defendants had the duty and the authority to enforce the University policies, including the Free Expression Policy, and state and local laws that prohibit individuals from blocking ingress and egress to campus buildings.

168.   Prior to the beginning of the Free Speech Event, the Defendants were aware that protestors were violating University policies and state and local laws by blocking access to the Free Speech Event.

169.   During the entire time the protestors were blocking access to the Free Speech Event, the Defendants made no effort to contact Plaintiffs to discuss how they could assist students in gaining access to the event.

170.   While the protestors were blocking access to the Free Speech Event, the University police officers did not make any effort to contact Plaintiffs to discuss how they could assist students in gaining access to the event.

171.   Upon information and belief, Defendants Covino and Wada-McKee instructed University police officers not to take any action to remove the protestors from blocking access to the doors or to otherwise assist any individuals in gaining access to attend the Free Speech Event.

172.   Upon information and belief, the Defendants refused to enforce University policies and state and local laws and allowed the protestors to block access to the Free Speech Event because the Defendants disagreed with the content and viewpoint of Shapiro's speech.

173.   The Defendants intentionally and deliberately allowed the protestors to act as a "heckler's veto" to suppress and silence Plaintiffs' free speech rights.

174.   The Defendants violated Plaintiffs' freedom of speech by their failure and refusal to comply with their duty to ensure that students have free ingress and egress to campus buildings and scheduled events.

175.   The Defendants' actions and failure to act violated Plaintiff Shapiro's freedom of speech because Shapiro was forced to speak to a half-full theater and was unable to convey his message to all of the intended audience.

176.   The Defendants' actions and failure to act violated Plaintiff YAF's freedom of speech because YAF was unable to convey its intended message to all of the intended audience.

177.   The Defendants' actions and failure to act violated Plaintiff Foundation's freedom of speech because the Foundation was unable to convey its intended message to all of the intended audience.

**Professor Defendants' Violation of Plaintiffs' Freedom of Speech**
**and False Imprisonment**

178.   Defendant Abdullah is an Assistant Professor of Pan African Studies at the University.

179.   Defendant Abdullah was instrumental in organizing the protest of the Free Speech Event.

180.   For at least a week prior to the event, Defendant Abdullah made numerous social media posts advertising a People Power Protest and encouraging people to show up at 1:00 p.m. to protest the Free Speech Event.  For example, Abdullah posted the following comment on Facebook in reference to the Free Speech Event: "I say this event is a problem…What we go'n do y'all?!?!"   Copies of a few social media posts are attached as Exhibit 14 to the Complaint.

181.   Upon information and belief, Defendant Abdullah also prepared flyers promoting a "Student Union Take-Over" beginning at 1:00 P.M. at the University Student Union Plaza.  The poster encouraged people to "Send Your Students."  A copy of the poster is attached as Exhibit 15 to the Complaint.

182.   The flyers were shared on social media by Defendant Abdullah prior to the Free Speech Event and posted throughout the campus on the day of the event.

183.   Defendant Weide is an Assistant Professor in the Sociology Department at the University.

184.   After YAF announced the Free Speech Event on its Facebook page, Defendant Weide made multiple posts on YAF's Facebook page in which he called YAF supporters "white supremacists" and compared them to Hitler.  A copy of the Facebook post is attached as Exhibit 16 to the Complaint.

185.   Defendant Weide even challenged the YAF supporters to a fight: "FYI tough guy provocateurs, we have open mat on campus in the gym in the USU building at 1 pm Friday and Noon on Saturday if you want to show us your white

supremacy.   Heads up though, I lift bro…"   A copy of the Facebook post is attached as Exhibit 17 to the Complaint.

186.   Defendant Weide followed that post with another post challenging the YAF supporters to a fight: "Hey if you've always wanted to choke one of your anti-fascist professors, this is your opportunity of a lifetime!  Don't pass it up…" See Exhibit 16.

187.   Approximately one week prior to the event, Amy Lutz, a Foundation staff member, and a YAF student member were accosted by Defendant Weide on campus while they were posting flyers on a bulletin board in the hallway of a University building.

188.   Defendant Weide ordered Ms. Lutz to stand still and began tearing down the flyers from the bulletin board and then he called security.

189.   While they were waiting for security, Defendant Weide told Ms. Lutz and the student that they could either leave or stay but if they left he would follow them.

190.   Defendant Weide called Ms. Lutz and the student "fascists." He then called a campus administrator and told her that Ms. Lutz and the student were intimidating him.

191.   Defendant Weide was very angry and kept demanding that Ms. Lutz provide him with her personal identification information.

192.   The University administrator asked Defendant Weide to calm down on several occasions because he was becoming very angry and aggressive.

193.   Campus security finally arrived and told Ms. Lutz and the student not to post flyers on the bulletin board.  Ms. Lutz and the student complied and were finally allowed to leave the building.

194.   The next day, Defendant Weide posted the following ominous message on his office door:  "The best response to micro-aggression is macro-aggression."  A picture of the message is attached as Exhibit 18 to the Complaint.

195.   Defendants Abdullah, Weide, Montalvo, and Bettcher (sometimes collectively referred to as the "Professor Defendants") all actively participated in the protests at the Free Speech Event.

196.   Defendant Bettcher participated in the protests at the Free Speech Event and blocked the doors to the theater by linking arms with other persons to block access.

197.   Defendant Montalvo participated in the protests at the Free Speech Event, including blocking both the front and back doors to the theater.

198.   Through their organization of and participation in the protest, the Professor Defendants physically prevented students from attending the Free Speech Event through threats, intimidation, or coercion.

199.   The Professor Defendants interfered with the First Amendment rights of Plaintiffs YAF, the Foundation, Kahanding, and Shapiro by preventing them from being able to communicate their message to all interested listeners.

200.   Kahanding is the President of Plaintiff YAF.  As the President of YAF, he arrived at the Student Union prior to the protestors blocking the doors and was able to enter the theater before the entrances were blocked.

201.   Kahanding was unlawfully forced to remain in the theater against his will for approximately 15 to 20 minutes after the end of the Free Speech Event because the protestors, including the Professor Defendants, were blocking both exits to the Theatre.

202.   Defendants Montalvo and Abdullah organized the protesters that prevented students from entering the Free Speech Event and prevented YAF, the Foundation, Kahanding, and Shapiro from communicating their message.

203.   After the Free Speech Event, Defendants Montalvo and Abdullah celebrated their "victory" in shutting down the Free Speech Event and infringing upon Plaintiffs' free speech rights.  In a Facebook post the day after the event, Abdullah stated:

> At nearly midnight they filed out of the Administration building to regroup for the next chapter of the struggle.  We debriefed and clasped hands under the moonlight, around a tree, and chanted Assata.
>
> As I wake this morning, I settle into a state of immense thanksgiving….that the world is moving, Spirit is overtaking us, the people are rising up, love is winning….even in the midst of intense struggle….beautiful struggle.

A copy of the Facebook post is attached as Exhibit 19 to the Complaint.

204.  In a Facebook post the day after the event, Montalvo praised and encouraged the protestors for their lawless and violent behavior:

> I am so proud of you Cal State LA black brown beautiful students who are so strong and so deep right now.  You are getting a true education in the work you are doing now putting history politics & social justice into practice beyond the classroom and into the core of your being because you know & please believe it is this love & spirit that will transform the world and you all bring that spirit of light life and love to us, to your mentors like Dr. Melina Abdullah.  You are the spirit of we who are mothers, we who give birth to life.  Thank you all for your passion your commitment and your love—we are truly blessed as fight this beautiful struggle.

Abdullah responded to the post: "Much love Sis.  I so appreciate being in this struggle with you."  A copy of the Facebook post is attached as Exhibit 20 to the Complaint.

205.  At a public event on May 17, 2016, Defendant Covino said that he ordered Police Chief Wall not to interfere with the protestors at the Free Speech Event, which prevented YAF, the Foundation, Kahanding, and Shapiro from communicating their message to all interested listeners and prevented students and others from attending the Free Speech Event.

**ALLEGATIONS OF LAW**

206.   At all times relevant to this Complaint, each and all of the acts and policies related to the Defendants alleged herein were attributed to the Defendants who acted under color of a statute, regulation, custom, or usage of the State of California.

207.   The University Defendants knew or should have known that they were violating Plaintiff YAF's constitutional rights by attempting to charge YAF a security fee based upon the content and viewpoint to be expressed at the Free Speech Event.

208.   The Defendants knew or should have known that by refusing to enforce University policies and state and local laws, the Defendants violated Plaintiffs' constitutional rights.

209.   YAF is suffering irreparable harm from the University Defendants' Security Fees Policy.

210.   YAF has no adequate or speedy remedy at law to correct or redress the deprivation of its rights by the Defendants.

211.   Unless the conduct of the Defendants and the Security Fees Policy are enjoined, YAF will continue to suffer irreparable injury.

**FIRST CAUSE OF ACTION**

**AGAINST THE UNIVERSITY DEFENDANTS**

**<u>Violation of YAF's First Amendment Right</u>**

**<u>to Freedom of Speech – Security Fees Policy</u>**

**<u>(42 U.S.C. § 1983)</u>**

212.   YAF repeats and realleges each of the allegations contained in paragraphs 1–211 of this Complaint.

213.   Speech is entitled to comprehensive protection under the First Amendment.

214.   Political speech is fully protected by the First Amendment.

215.   The First Amendment rights of free speech extend to campuses of state universities.

216.   The sidewalks and open spaces of the University's campus are designated public forums—if not traditional public forums—for speech and expressive activities by students enrolled at CSU-LA.

217.   The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits content and viewpoint discrimination in the public forums for student speech and expression on the campus of a public university.

218.   A public university's ability to restrict speech—particularly student speech—in a public forum is limited.

219.   The First Amendment's Free Speech Clause prohibits censorship of political expression.

220.   Under the First Amendment's Free Speech Clause, a prior restraint on citizens' expression is presumptively unconstitutional, unless it (1) does not delegate overly broad licensing discretion to a government official, (2) contains only content and viewpoint neutral reasonable time, place, and manner restrictions, (3) is narrowly tailored to serve a significant governmental interest, and (4) leaves open ample alternative means for communication.

221.   The University Defendants' Security Fees Policy and their practice of charging student organizations a security fee for "controversial" events violates the First Amendment facially because it is a prior restraint on speech in areas of campus that are traditional or designated public fora for CSU-LA students.

222.   Unbridled discretion to discriminate against speech based on its content or viewpoint violates the First Amendment regardless of whether that discretion has ever been unconstitutionally applied in practice.

223.   The University Defendants' Security Fees Policy and their practice of charging student organizations a security fee for "controversial" events or based on

listeners' reactions violates the First Amendment facially because they grant CSU-LA officials unbridled discretion to discriminate against speech based on its content or viewpoint.

224. The University Defendants' Security Fees Policy and associated practice provide no narrow, objective, or definite standards to limit the discretion of CSU-LA officials in deciding whether to require security at a student organization event.

225. The University Defendants' Security Fees Policy and associated practice do not require CSU-LA officials to provide written justification for their decision to impose a security fee on student speech.

226. The University Defendants' Security Fees Policy and associated practice provide no appeal process that students may utilize when charged security fees for events.

227. These grants of unbridled discretion to CSU-LA officials violate the First Amendment because they create a system in which speech is reviewed without any standards, thus giving students no way to prove that imposing a security fee for their event was based on unconstitutional considerations.

228. Because the University Defendants have failed to establish narrow, objective, and definite standards governing the imposition of security fees on student organization events, there is a substantial risk that CSU-LA officials will engage in content and viewpoint discrimination when addressing those applications.

229. The First Amendment's prohibition against content and viewpoint discrimination requires the University Defendants to provide adequate safeguards to protect against the improper imposition of security fees based on the content or viewpoint of students' speech.

230.   The University Defendants' Security Fees Policy and associated practice of charging student organizations a security fee for "controversial" events requires, on its face, content- and viewpoint-based discrimination.

231.   The University Defendants engaged in content- and viewpoint-based discrimination by examining whether YAF's speech was "controversial" and how listeners might react to the speech.

232.   The University Defendants' Security Fees Policy and associated practice of charging student organizations a security fee for "controversial" events is an unconstitutional "time," "place," and "manner" restriction that violates YAF's and other students' right to freedom of speech and expression.

233.   The University Defendants' Security Fees Policy and associated practice are neither reasonable nor valid time, place, and manner restrictions on speech because they are not content-neutral, they are not narrowly tailored to serve a significant government interest, and they do not leave open ample alternative channels of communication.

234.   While the University Defendants have an interest in maintaining a safe campus, the assessment of security fees on "controversial" speech but not other speech is not narrowly tailored to the University Defendants' interest.

235.   Under the University Defendants' Security Fees Policy, "controversial" events have no alternative channels of communication because they must pay security fees everywhere on campus.

236.   The First Amendment's Freedom of Speech Clause prohibits a public university from imposing fees on student speech based on overbroad regulations.

237.   The University Defendants' Security Fees Policy and associated practice are overbroad because they prohibit and restrict protected expression.

238.   The University Defendants' Security Fees Policy and associated practice unconstitutionally impose fees on all private student speech that occurs on

campus that the University Defendants, in their unbridled discretion, designate as "controversial."

239. The overbreadth of the University Defendants' policies and related practice chill the speech of students not before the Court who seek to engage in private expression on campus.

240. The University Defendants' Security Fees Policy and associated practice chill, deter, and restrict YAF from freely expressing its political beliefs.

241. The University Defendants' Security Fees Policy and associated practice violate YAF's right to free speech as guaranteed by the First Amendment to the United States Constitution.

242. Pursuant to 42 U.S.C. §§ 1983 and 1988, YAF is entitled to a declaration that the University Defendants' Security Fees Policy violates its First Amendment right to freedom of speech and an injunction against Defendants' policy and actions both facially and as applied. Additionally, YAF is entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## SECOND CAUSE OF ACTION
## AGAINST THE UNIVERSITY DEFENDANTS
## <u>Violation of YAF's Fourteenth Amendment Right</u>
## <u>to Due Process of Law – Security Fees Policy</u>
## <u>(42 U.S.C. § 1983)</u>

243. YAF repeats and realleges each of the allegations contained in paragraphs 1–211 of this Complaint, as if set forth fully herein.

244. The Fourteenth Amendment to the United States Constitution guarantees YAF the right to due process of law and prohibits the University Defendants from promulgating and employing vague standards that allow for viewpoint discrimination in the University Defendants' handling of YAF's on-campus expression.

245.   The government may not regulate speech based on policies that permit arbitrary, discriminatory, and overzealous enforcement.

246.   The government may not regulate speech based on policies that cause persons of common intelligence to guess at their meaning and differ as to their application.

247.   The University Defendants' Security Fees Policy and associated practice contain no criteria to guide administrators when deciding whether security is necessary at a student organization event.

248.   The University Defendants' Security Fees Policy and associated practice are impermissibly vague and ambiguous and are thus incapable of providing meaningful guidance to the University Defendants.

249.   The lack of criteria, factors, or standards in the University Defendants' Security Fees Policy and associated practice renders the policy and practice unconstitutionally vague and in violation of YAF's right to due process of law under the Fourteenth Amendment.

250.   Because of the University Defendants' actions, YAF has suffered, and continue to suffer, economic injury and irreparable harm.  YAF is entitled to an award of monetary damages and equitable relief.

251.   Pursuant to 42 U.S.C. §§ 1983 and 1988, YAF is entitled to a declaration that the University Defendants violated its Fourteenth Amendment right to due process of law and an injunction against the University Defendants' policy and actions.  Additionally, YAF is entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including its reasonable attorneys' fees.

**THIRD CAUSE OF ACTION**

**AGAINST ALL DEFENDANTS**

**<u>Violation of Plaintiffs' First Amendment Right</u>**

**<u>to Freedom of Speech – The Free Speech Event</u>**

**<u>(42 U.S.C. § 1983)</u>**

252.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–211 of this Complaint, as if set forth fully herein.

253.   Based upon the allegations set forth above, the Defendants deprived Plaintiffs of their right to freedom of speech in violation of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

254.   At all relevant times, Plaintiffs were engaged in speech activity, specifically the Free Speech Event, that is fully protected by the First Amendment.

255.   The Defendants' actions injured Plaintiffs in a way likely to chill a person of ordinary firmness from further participation in that activity.

256.   Plaintiffs' constitutionally protected activity motivated the Defendants' actions.  The Defendants acted with a retaliatory intent or motive.

257.   It was clearly established on February 25, 2016 that Defendants had a constitutional duty not to ratify and effectuate a heckler's veto nor join a mob intent on suppressing speech.

258.   The Defendants were required to take reasonable action to protect persons exercising their constitutional rights, including Plaintiffs, from unlawful, disorderly and disruptive conduct.  By failing to do so, the Defendants violated Plaintiffs' rights protected by the First Amendment.

259.   By effectuating a heckler's veto as set forth above, the Defendants' actions were content- and viewpoint-based in violation of the First Amendment.

260.   The Defendants' enforcement of a heckler's veto against Plaintiffs violated Plaintiffs' right to freedom of speech protected by the First Amendment.

261.   By ratifying and effectuating a heckler's veto and thus joining a mob intent on suppressing speech, the Defendants have effectively denied Plaintiffs the right to use a public forum for their expressive activity based on the content and viewpoint of Plaintiffs' message in violation of the First Amendment.

262.   By granting use of a public forum to people whose views the Defendants find acceptable, but denying use to those expressing less favored views, Defendants violated Plaintiffs' First Amendment right to freedom of speech.

263.   By refusing to enforce their own policies and procedures, which require the Defendants to protect Plaintiffs' speech activity, based on the adverse reaction of others to the content and viewpoint of Plaintiffs' message, Defendants violated Plaintiffs' First Amendment right to freedom of speech.

264.   By refusing to protect Plaintiffs' speech activity and permitting protestors to engage in unlawful, disorderly, and disruptive conduct designed to silence Plaintiffs' message based on its content and viewpoint, the Defendants have violated Plaintiffs' First Amendment right to freedom of speech.

265.   By denying Plaintiffs access to a public forum to engage in their speech activities, which the Defendants disfavor, while permitting protestors, including the Professor Defendants, to engage in unlawful, disorderly, and disruptive conduct designed to suppress Plaintiffs' message, the Defendants have effectively denied the use of this forum to those whose expressive activities the Defendants find unacceptable in violation of Plaintiffs' First Amendment right to freedom of speech.

266.   As a direct and proximate result of the Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory relief and injunctive relief.  Additionally, Plaintiffs are entitled to damages in an amount to be determined by the evidence and this Court, including, but not limited to the

$17,807.93 in expenses incurred by the Foundation, and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION

### AGAINST ALL DEFENDANTS

### Violation of Plaintiffs' Fourteenth Amendment Right
### to Equal Protection of the Law – The Free Speech Event
### (42 U.S.C. § 1983)

267.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–211 of this Complaint, as if set forth fully herein.

268.   The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the equal protection of the laws, which prohibits the Defendants from treating Plaintiffs differently than similarly situated persons.

269.   The government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

270.   YAF and Kahanding are similarly situated to other students at CSU-LA.  Shapiro and the Foundation are similarly situated to all other non-students that are invited onto CSU-LA's campus.

271.   The Defendants' Free Expression Policy prohibits persons from blocking ingress and egress into and out of campus buildings and disrupting any event or activity by a user that is authorized to use University facilities.

272.   State and local fire laws prohibit a manager of a building from allowing an overcrowded condition or use of a building without providing the required exits.

273.   By ratifying and effectuating a heckler's veto and thus join a mob intent on suppressing speech, the Defendants denied Plaintiffs the right to use a public forum for their expressive activity based on the content and viewpoint of

Plaintiffs' message in violation of the Equal Protection Clause of the Fourteenth Amendment.

274.  By granting use of a public forum to people whose views the Defendants find acceptable, but denying use to those expressing less favored views, the Defendants have violated the Equal Protection Clause of the Fourteenth Amendment.

275.  By refusing to enforce their own policies and regulations, which require the Defendants to protect Plaintiffs' speech activity, based on the adverse reaction of others to the content and viewpoint of Plaintiffs' message, the Defendants have deprived Plaintiffs of the equal protection of the law guaranteed by the Fourteenth Amendment.

276.  By refusing to protect Plaintiffs' speech activity and permitting protestors to engage in unlawful, disorderly, and disruptive conduct designed to silence Plaintiffs' message based on its content and viewpoint, the Defendants imposed a heckler's veto and deprived Plaintiffs of the equal protection of the law guaranteed by the Fourteenth Amendment.

277.  By denying Plaintiffs access to a public forum to engage in their speech activities, which the Defendants disfavor, while permitting protestors to engage in unlawful, disorderly, and disruptive conduct designed to suppress Plaintiffs' message, the Defendants denied the use of this forum to those whose expressive activities the Defendants find unacceptable in violation of the Equal Protection Clause of the Fourteenth Amendment.

278.  The Defendants chose to selectively enforce the law and their own policies, practices, procedures, rules and regulations, and state and local laws out of an arbitrary desire to discriminate against Plaintiffs based on the content and viewpoint of Plaintiffs' speech in violation of the Equal Protection Clause of the Fourteenth Amendment.

279.   The Defendants lack a rational or compelling state interest for such disparate treatment of Plaintiffs.

280.   Because of the Defendants' actions, Plaintiffs have suffered, and continue to suffer irreparable harm.   They are entitled to an award of monetary damages and equitable relief.

281.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that the Defendants violated their Fourteenth Amendment right to equal protection of the law and an injunction against the Defendants' policy and actions. Additionally, Plaintiffs are entitled to damages in an amount to be determined by the evidence and this Court, including, but not limited to the $17,807.93 in expenses incurred by the Foundation, and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**FIFTH CAUSE OF ACTION**

**AGAINST THE PROFESSOR DEFENDANTS**

**<u>Violation of California's Bane Act</u>**

**<u>(Cal. Civ. Code § 52.1)</u>**

282.   The Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–211 of this Complaint, as if set forth fully herein.

283.   As set forth in the allegations above, Plaintiffs YAF, Shapiro, the Foundation, and Kahanding desired to communicate a message to students and others that were unable to attend the event.

284.   Through their participation in the protest, the Professor Defendants prohibited students and others from attending the Free Speech Event by threat, intimidation, or coercion.

285.   The Professor Defendants' actions interfered with the Plaintiffs' First Amendment rights to freedom of speech.

286.   Because of the Professor Defendants' actions, the Plaintiffs suffered, and continue to suffer, economic injury and irreparable harm.   Each of the

Plaintiffs are entitled to a declaratory judgment and injunctive relief preventing the Professor Defendants from interfering with Plaintiffs' expressive activities in the future, an award of monetary damages, exemplary damages, civil penalty of $25,000 against each Defendant, and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**SIXTH CAUSE OF ACTION**

**AGAINST THE PROFESSOR DEFENDANTS**

**<u>False Imprisonment</u>**

287.   Plaintiff Kahanding repeats and realleges each of the allegations contained in paragraphs 1–211 of this Complaint, as if set forth fully herein.

288.   As set forth in the allegations above, by blocking the exits to the theater, the Professor Defendants caused Plaintiff Kahanding to be confined in the theater against his will for an appreciable period of time.

289.   The Professor Defendants did not have any lawful privilege to confine Plaintiff Kahanding in the theater against his will.

290.   Because of the Professor Defendants' unlawful actions, Plaintiff Kahanding has suffered, and continues to suffer harm.  He is entitled to an award of monetary damages and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

**SEVENTH CAUSE OF ACTION**

**AGAINST THE PROFESSOR DEFENDANTS**

**<u>Aiding and Abetting a Tort</u>**

291.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–211 of this Complaint, as if set forth fully herein.

292.   As set forth in the allegations above, the Professor Defendants organized the protest with the intent to shut down the Free Speech Event.

293.   The Professor Defendants knew that blocking access to the Free Speech Event was a breach of duty that the protestors had to the Plaintiffs.

294.   The Professor Defendants provided substantial encouragement and assistance to the protestors in blocking access to the Free Speech Event which resulted in the violation of Plaintiffs' First Amendment rights.

295.   The Professor Defendants actively participated in blocking access to the doors to the theater which prohibited students and others from being able to attend the Free Speech Event and prevented Plaintiffs Kahanding, YAF, Shapiro, and the Foundation from communicating their message to all intended listeners.

296.   Because of the Professor Defendants' unlawful actions, Plaintiffs have suffered, and continue to suffer harm.   Plaintiffs are entitled to an award of monetary damages, including, but not limited to the $17,807.93 in expenses incurred by the Foundation, and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

(A)   A declaratory judgment that the University Defendants' Security Fees Policy and associated practices, facially, and as applied, violate Plaintiff YAF's rights under the First Amendment and Fourteenth Amendment;

(B)   A declaratory judgment that the Defendants' failure and refusal to enforce University polices and state and local laws violated Plaintiffs' rights under the First and Fourteenth Amendments;

(C)   A declaratory judgment that the Professor Defendants violated the Bane Act.

(D)   A declaratory judgment that the Professor Defendants caused Plaintiff Kahanding to be falsely imprisoned.

(E)   A declaratory judgment that the Professor Defendants aided and abetted a tort against Plaintiffs.

| | | |
|---|---|---|
| 1 | (F) | A preliminary and permanent injunction prohibiting the University |
| 2 | | Defendants, their agents, officials, servants, employees, and any other |
| 3 | | persons acting on their behalf from enforcing the Security Fees Policy |
| 4 | | and associated practices challenged in this Complaint; |
| 5 | (G) | A preliminary and permanent injunction prohibiting the Defendants, |
| 6 | | their agents, officials, servants, employees, and any other persons |
| 7 | | acting on their behalf from disrupting or preventing Plaintiffs from |
| 8 | | engaging in lawful First Amendment activity at the University; |
| 9 | (H) | Compensatory and nominal damages for the violation of Plaintiffs' |
| 10 | | First and Fourteenth Amendment rights; |
| 11 | (I) | Compensatory damages and civil penalties for the violation of the |
| 12 | | Bane Act, false imprisonment, and aiding and abetting a tort. |
| 13 | (J) | Plaintiffs' reasonable attorneys' fees, costs, and other costs and |
| 14 | | disbursements in this action pursuant to 42 U.S.C. § 1988; and |
| 15 | (K) | All other further relief to which Plaintiffs may be entitled. |

Respectfully submitted this 19th day of May, 2016.

By: /s/ David J. Hacker

DAVID J. HACKER
CA Bar No. 249272
ALLIANCE DEFENDING FREEDOM
101 Parkshore Drive, Suite 100
Folsom, CA 95630
(916) 932-2850
(916) 932-2851 Fax

TYSON C. LANGHOFER
AZ Bar No. 32589
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0021 Fax
tlanghofer@ADFlegal.org

43

DAVID A. CORTMAN
GA Bar No. 188810
TRAVIS C. BARHAM
GA Bar No. 753251
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE,
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339–0774
(770) 339–6744 Fax
dcortman@ADFlegal.org
tbarham@ADFlegal.org

STEPHEN SHEPARD
CA Bar No. 153619
STEPHEN SHEPARD ATTORNEY AT LAW
7755 Center Avenue, Suite 1100
Huntington Beach, CA 92647
(714) 372-2228
(714) 903-3328 Fax
stephen@stephenshepard.com

*Attorneys for Plaintiffs*

*Pro Hac Vice* Applications Forthcoming

## DEMAND FOR TRIAL BY JURY

Plaintiff demands trial by jury of all matters so triable herein.

By: /s/ David J. Hacker
     DAVID J. HACKER
     *Attorney for Plaintiffs*

1

## VERIFICATION OF COMPLAINT

2

3    I, Patrick X. Coyle, Jr., Vice President of Young America's Foundation, and

4    a citizen of the United States and a resident of the State of Virginia, hereby declare

5
6    under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the

7    foregoing Verified Complaint and the factual allegations therein, and the facts as

8    alleged are true and correct.
9
10    Executed this **18** day of May, 2016, at _Reston_, Virginia.

11

12

13

14                          Patrick X. Coyle, Jr., Vice President
15                          Young America's Foundation

16

17

18

19

20

21

22

23

24

25

26

27

28

49

# **VERIFICATION OF COMPLAINT**

I, Mark Kahanding, President of CSULA Young Americans for Freedom, and a citizen of the United States and a resident of the State of California, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this __19__ day of May, 2016, at __Glendale__, California.



Mark Kahanding, President
CSULA Young Americans for Freedom

**VERIFICATION OF COMPLAINT**

I, Ben Shapiro, a citizen of the United States and a resident of the State of California, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this _18th_ day of May, 2016, at _Los Angeles_ , California.

_____

Ben Shapiro

52

1

# VERIFICATION OF COMPLAINT

2

3    I, Mark Kahanding, a citizen of the United States and a resident of the State

4    of California, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746

5

6    that I have read the foregoing Verified Complaint and the factual allegations

7    therein, and the facts as alleged are true and correct.

8    Executed this _19_ day of May, 2016, at Glendale, California.

9

10

11

12

13                        Mark Kahanding

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28