1
2
3
4
5

TYSON C. LANGHOFER, AZ Bar No. 32589*
tlanghofer@ADFlegal.org
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0021 Fax

6
7

*Attorneys for Plaintiffs*

8
9

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16

**YOUNG AMERICA'S FOUNDATION**; **CSULA YOUNG AMERICANS FOR FREEDOM**, a registered student organization at California State University-Los Angeles; **BEN SHAPIRO; MARK KAHANDING;** and **OLIVIA KARAPANIAN,**

      Plaintiffs,

17

v.

18
19
20
21
22
23
24
25
26
27

**WILLIAM COVINO**, President of California State University-Los Angeles, in his official and individual capacities; **NANCY WADA-MCKEE**, Vice President for Student Life of California State University-Los Angeles, in her official and individual capacities; **LISA CHAVEZ**, Vice President for Administration and Chief Financial Officer of California State University-Los Angeles, in her official and individual capacities; **JOHN ORTIZ**, Director of Operations for the

Case No. 2:16-cv-03474-DSF

**DEMAND FOR JURY TRIAL**


**SECOND AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, MONETARY DAMAGES, AND ATTORNEYS' FEES AND COSTS**

28

1

University Student Union of California State University-Los Angeles, in his official and individual capacities; **MELINA ABDULLAH**, Assistant Professor at California State University-Los Angeles, in her official and individual capacities; **LUZ BORJON**, Coordinator of Undocumented Students Program at California State University-Los Angeles, in her official and individual capacities; **ROBERT WEIDE**, Assistant Professor at California State University-Los Angeles, in his official and individual capacities; **TALIA MAE BETTCHER**, Professor and Chair of Philosophy Department at California State University-Los Angeles, in her official and individual capacities; and **STEVE TEIXEIRA**, Career Services Specialist, in his official and individual capacities,

Defendants.

Plaintiffs Young America's Foundation, CSULA Young Americans for Freedom, Ben Shapiro, Mark Kahanding, and Olivia Karapanian by and through counsel, and for their Second Amended Verified Complaint against the Defendants, hereby state as follows:

1.   The cornerstone of higher education is the ability of students to participate in the "marketplace of ideas" on campus. That marketplace depends on free and vigorous debate between students, and the ability to offer diverse and competing views on current and age-old topics.

2.   This case arises from policies and practices of California State University-Los Angeles ("CSU-LA" or the "University") and public officials

2

employed by the University that restrict the expressive rights of students and student organizations.

3.      CSU-LA has an unwritten policy and practice that it uses to censor, restrict, and inhibit unpopular student speech, thus unconstitutionally infringing upon students' First Amendment and Fourteenth Amendment rights (the "Speech Suppression Policy").

4.      The Speech Suppression Policy has been enacted, created and put in place by Defendant William Covino, the President of CSU-LA, as a policy maker.

5.      The Speech Suppression Policy authorizes the Defendants to prohibit, chill, oppose and shut down speech with which they, or other students and faculty, disagree.

6.      Defendants have applied this Policy against Plaintiffs and have stated that they will continue to do so in the future.

7.      The University also uses its Security Fees Policy to restrict student speech by requiring students to pay for security if they wish to engage in protected speech that the University, or other students and faculty, disagree with or deems controversial.

8.      The Speech Suppression Policy and Security Fees Policy chill protected student speech and disable students from engaging in debates about important political, cultural, moral and religious topics.

9.      When Plaintiff CSULA Young Americans for Freedom ("YAF"), a registered student organization at the University, submitted a request to bring Plaintiff Ben Shapiro ("Shapiro") to campus to speak, the University approved the request, but pursuant to the Security Fees Policy required YAF to pay over $600 for security for the event because the University arbitrarily classified Shapiro's speech as "controversial."

10.     When YAF objected to the impropriety of the security fees through counsel, the University relented and agreed not to impose them.

11.    Instead, pursuant to the Speech Suppression Policy, just three days prior to the scheduled event, Defendant Covino sent an e-mail to YAF canceling the event because it would be "best for our campus community" but stating that he would schedule a "more inclusive event" where Shapiro could speak "as part of a group of speakers with differing viewpoints on diversity."

12.    YAF refused to agree to the unconstitutional censorship by Defendant Covino and instead chose to proceed with the event as originally approved and scheduled.

13.    Pursuant to the Speech Suppression Policy, on the day of the event, Defendants Covino, Wada-McKee and Chavez instructed the police to permit hundreds of students and faculty to flood the University's Student Union and physically block access to the theater in which Shapiro was scheduled to speak.

14.    Pursuant to the Speech Suppression Policy, numerous professors and faculty of the University assisted with organizing the blockade, encouraged their students to attend it, participated in physically blocking the doors to the theater, and encouraged students to do the same.  Defendants Melina Abdullah, Luz Borjon, Robert Donald Weide, Talia Mae Bettcher, and Steve Teixeira were among those professors and faculty involved.

15.    As a result of the blockade, many students were prevented from attending and participating in the speaking event, including Plaintiff Olivia Karapanian, and Shapiro was forced to speak to a half-empty theater.

16.    By blocking ingress and egress to the theater pursuant to the Speech Suppression Policy, the participants in the blockade violated the rights of the Plaintiffs, in addition to violating other University policies and state and local laws, and thereby created a serious safety hazard for those both inside and outside the theater.

17.    Through their enforcement of the Speech Suppression Policy, the Defendants suppressed Plaintiffs' speech by encouraging and participating with the

blockaders to engage in an unlawful assembly and to block ingress and egress to the theater—all because Defendants and others students and faculty members disagreed with the content and viewpoint of Plaintiffs' speech.

18. This action is premised on the United States Constitution and concerns the denial of Plaintiffs' fundamental rights to free speech, due process, and equal protection of law.

19. Defendants' Speech Suppression Policy and Security Fees Policy and practices have deprived and will continue to deprive Plaintiffs of their paramount rights and guarantees under the United States Constitution.

20. Each and every act of Defendants alleged herein was committed by such Defendants, each and every one of them, under the color of state law and authority.

## JURISDICTION AND VENUE

21. This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

22. This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

23. This Court has supplemental jurisdiction over the state law claims made herein pursuant to 28 U.S.C. § 1367.

24. This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343 and Cal. Civ. Code § 52.1(b); the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-02 and Cal. Civ. Code § 52.1(b); the requested injunctive relief pursuant to 28 U.S.C. § 1343, Cal. Civ. Code § 52.1(b), and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(h).

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this district and all of the acts described in this Complaint occurred in this district.

## PLAINTIFFS

26.     Plaintiff Young America's Foundation (the "Foundation") is a nonprofit organization whose mission is to educate the public on the ideas of individual freedom, a strong national defense, free enterprise, traditional values, and leadership.

27.     Plaintiff CSULA Young Americans for Freedom ("YAF") is an expressive, recognized student organization at the University.  YAF's purpose is to bring students together to advocate for the ideas of limited government, individual freedom, free enterprise, traditional values, and a strong national defense.

28.     YAF is a project of the Foundation, thus, all student YAF chapters, like Plaintiff YAF in this lawsuit, are affiliates of the Foundation.

29.     YAF desires to express its message on the University campus through a variety of means including flyers, signs, peaceful demonstrations, hosting tables with information, inviting speakers to campus, and talking with fellow students about individual freedom, free markets, and limited government, among other things.

30.     When engaging in these expressive activities, YAF and its members discuss political, religious, social, cultural, and moral issues and ideas.

31.     Plaintiff Ben Shapiro ("Shapiro"), is a resident of North Hollywood, California, and is an American political commentator, nationally syndicated columnist, author, radio talk show host, and attorney.

32.     Plaintiff Mark Kahanding ("Kahanding") is a resident of Glendale, California, a student at the University, and is the President and founder of YAF.

33.     Plaintiff Olivia Karapanian ("Karapanian") is a resident of Tujunga, California, and was a student at the University, and a member of YAF at the time Shapiro came to speak on campus.

## DEFENDANTS

34.     Defendant William Covino ("Covino") is, and was at all times relevant to this Complaint, the President of California State University-Los Angeles, a public university organized and existing under the laws of the State of California.

35.     The California State University Board of Trustees has designated the University President as the chief executive officer and administrative head of CSU-LA.

36.     Defendant Covino, as a policy maker, is responsible for the enactment, implementation, and enforcement of University policies and their application to student speech.

37.     Defendant Covino is responsible for the enactment, implementation, and enforcement of the Speech Suppression Policy and Security Fees Policy.

38.     Defendant Covino is aware of the Security Fees Policy, and has the authority to change the policy, but he has not modified the policy to ensure that the University does not unconstitutionally impose security fees based upon the content or viewpoint of student speech.

39.     As a policymaker, Defendant Covino enacted the Speech Suppression Policy, and he enforced the Speech Suppression Policy against Plaintiffs when he cancelled Shapiro's speech, and then interfered with the event by ordering University police not to move blockaders away from the theater doors, which prevented students and the public from attending the speech because he disagreed with the content and viewpoint of Plaintiffs' speech.

40.     Defendant Covino was aware of the actions taken by the other Administrator Defendants and Faculty Defendants to enforce the Speech

Suppression Policy against the Plaintiffs and he ratified those actions by approving of them and because he did not act to stop their actions enforcing the policy.

41.    Defendant Covino is sued in his official and individual capacities.

42.    Defendant Nancy Wada-McKee ("Wada-McKee") is, and was at all times relevant to this Complaint, the Vice President for Student Life at California State University-Los Angeles, a public university organized and existing under the laws of the State of California.

43.    Defendant Wada-McKee, in consultation with Defendant Covino, is responsible for the administration, interpretation, and oversight of certain University policies, including the Security Fees Policy and Speech Suppression Policy, and their application to student speech.

44.    Defendant Wada-McKee enforced the Speech Suppression Policy against Plaintiffs when she ordered University police not to move blockaders away from the theater doors, which prevented students and members of the public from attending the speech because she disagreed with the content and viewpoint of Plaintiffs' speech.

45.    Defendant Wada-McKee is sued in her official and individual capacities.

46.    Defendant Lisa Chavez ("Chavez") is, and was at all times relevant to this Complaint, the Vice President for Administration and Chief Financial Officer of California State University-Los Angeles, a public university organized and existing under the laws of the State of California.

47.    Defendant Chavez, in consultation with Defendants Covino and Wada-McKee, is responsible for the administration, interpretation, and oversight of certain University policies, including the Speech Suppression Policy and Security Fees Policy, and their application to student speech.

48.    Defendant Chavez enforced the Speech Suppression Policy against Plaintiffs when she ordered University police not to move blockaders away from the

theater doors, which prevented students and members of the public from attending the speech because she disagreed with the content and viewpoint of Plaintiffs' speech.

49.     Defendant Chavez is sued in her official and individual capacities.

50.     Defendant John Ortiz ("Ortiz") is, and was at all times relevant to this Complaint, the Director of Operations of the University Student Union at California State University-Los Angeles, a public university organized and existing under the laws of the State of California.

51.     Defendant Ortiz possesses the authority to enforce Student Union policies and to require student groups to pay the University for security costs incurred as a result of events hosted by student groups at the University Student Union.

52.     Defendant Ortiz enforced the Security Fees Policy against Plaintiff YAF when he made the initial decision requiring YAF to pay the University to provide security for Shapiro's speech because he deemed Shapiro's speech to be controversial.

53.     Defendant Ortiz enforced the Speech Suppression Policy against Plaintiffs when he allowed the blockade of the Free Speech Event because he disagreed with the content and viewpoint of Plaintiffs' speech.

54.     Defendant Ortiz is sued in his official and individual capacities.

55.     Defendant Melina Abdullah is, and was at all times relevant to this Complaint, an Assistant Professor of Pan African Studies at the University.

56.     Defendant Abdullah enforced the Speech Suppression Policy against Plaintiffs, by her own actions and encouraging and organizing the actions of others, when she physically prevented Karapanian, other students, and members of the public from attending Shapiro's speech and prevented Plaintiffs from communicating their message to all interested listeners because she disagreed with the content and viewpoint of Plaintiffs' speech.

57.     Defendant Abdullah is sued in her official and individual capacities.

58.     Defendant Robert Weide is, and was at all times relevant to this Complaint, an Assistant Professor in the Sociology department at the University.

59.     Defendant Weide enforced the Speech Suppression Policy against Plaintiffs, by his own actions and encouraging and organizing the actions of others, when he tore down the Foundation's and YAF's posters, physically prevented Karapanian, other students, and members of the public from attending Shapiro's speech, and prevented Plaintiffs from communicating their message to all interested listeners because he disagreed with the content and viewpoint of Plaintiffs' speech.

60.     Defendant Weide is sued in his official and individual capacities.

61.     Defendant Luz Borjon ("Borjon") is, and was at all times relevant to this Complaint, the Coordinator of Undocumented Students at the University.

62.     Defendant Borjon enforced the Speech Suppression Policy against Plaintiffs, by her own actions and encouraging and organizing the actions of others, when she physically prevented Karapanian, other students, and members of the public from attending Shapiro's speech and prevented Plaintiffs from communicating their message to all interested listeners because she disagreed with the content and viewpoint of Plaintiffs' speech.

63.     Defendant Borjon is sued in her official and individual capacities.

64.     Defendant Talia Mae Bettcher ("Bettcher") is, and was at all times relevant to this Complaint, a Professor and Chair of the Philosophy Department at the University.

65.     Defendant Bettcher enforced the Speech Suppression Policy against Plaintiffs, by her own actions and encouraging and organizing the actions of others, when she physically prevented Karapanian, others students, and members of the public from attending Shapiro's speech and prevented Plaintiffs from communicating their message to all interested listeners because she disagreed with the content and viewpoint of Plaintiffs' speech.

66.     Defendant Bettcher is sued in her official and individual capacities.

67.     Defendant Steve Teixeira ("Teixeira") is, and was at all times relevant to this Complaint, a Career Services Specialist at the University.

68.     Defendant Teixeira enforced the Speech Suppression Policy against Plaintiffs, by his own actions and encouraging and organizing the actions of others, when he physically prevented Karapanian, other students, and members of the public from attending Shapiro's speech and prevented Plaintiffs from communicating their message to all interested listeners because he disagreed with the content and viewpoint of Plaintiffs' speech.

69.     Defendant Teixeira is sued in his official and individual capacities.

## FACTUAL BACKGROUND

70.     CSU-LA is a public university created by the State of California and located in Los Angeles, California.

71.     The trustees of the California State University System have delegated power to Defendant Covino to act as the administrative head of CSU-LA.

72.     California Education Code § 89035 authorizes the trustees of the California State University System to "adopt a rule delegating . . . power to any officer, employee, or committee as the trustees may designate."

73.     Defendant Covino is responsible for the enactment, implementation, and enforcement of CSU-LA policies affecting students, student organizations, faculty, and guests, including the Policies challenged herein.

74.     The California Code of Regulations, 5 Cal. Code Regs. § 42402, provides that the "president of each campus is responsible for the educational effectiveness, academic excellence, and general welfare of the campus over which he presides."

75.     CSU-LA sets forth its policies and procedures through an Administrative Procedures Manual.

11

76.     CSU-LA   Administrative   Procedure   001   §   6.0   states   that   the responsibilities of Defendant Covino include to "review, approve and sign Administrative Procedures after final review," and "implement new procedures or revisions to existing procedures on an interim basis until the formal review process is completed if determined to be in the best interests of the University."

**I.      Defendants' Unconstitutional Policies**

**A.      Speech Suppression Policy**

77.     Pursuant to his authority as President of the University and as a policymaker, Defendant Covino implemented the Speech Suppression Policy as an unwritten policy and practice of the University.

78.     The Speech Suppression Policy authorizes Defendant Covino, as President of the University, to suppress, interfere with, or prohibit unpopular or disfavored speech because he or other members of the University community disagree with the content or viewpoint of the speaker or because the speaker is considered controversial by him or other members of the University community.

79.     The Speech Suppression Policy authorizes and encourages students and faculty members, including Defendants Abdullah, Borjon, Weide, Bettcher, and Teixeira (the "Faculty Defendants"), to suppress, interfere with, or prohibit disfavored or unpopular speech by organizing and encouraging other faculty members and students to physically block access to speakers on campus and by participating personally in those blockades because they disagree with the content or viewpoint of the speaker.

80.     Ironically, even though the University maintains several policies that are designed to protect student speech, such as Administrative Procedure 404 (the "Public Meetings Policy"), Statement of Student Rights and Responsibilities (the "Students' Rights Policy"), Statement on Professional Ethics, Administrative Policy P-004 (the "Campus Violence Policy"), and Administrative Policy P007 (the "Free

Expression Policy"), Defendants have instead chosen to create and enforce the Speech Suppression Policy and practice.

81.    The Speech Suppression Policy has been created and enforced to supersede these other University policies.

82.    Pursuant to the Speech Suppression Policy, the Defendants and other University administrators and faculty are authorized not to enforce or may selectively enforce these free speech policies if they or other members of the University community disagree with the content or viewpoint expressed by an invited speaker, a student, or student organization.

83.    The Speech Suppression Policy authorizes and encourages Defendants and other University administrators and faculty to facilitate and personally participate with the University community in harassing, suppressing, blocking and shutting down unpopular speech, and to refuse to provide, or restrict the provision of, police protection for students or student organizations that promote speech with which the University administrators disagree or which are unpopular among faculty and/or students.

**B.    Administrator Defendants' Security Fees Policies**

**1.    Administrator Defendants' First Security Fees Policy**

84.    The University imposes security fees on students and student organizations through its Facilities Use Policy and Security at Campus Events Policy (these policies are collectively referred to as the "Security Fees Policy").

85.    At the time the original Complaint was filed, CSU-LA governed the use of its facilities and equipment through Administrative Procedure 505 (the "First Facilities Use Policy"). A copy of the First Facilities Use Policy is attached as Exhibit 1 to this Second Amended Verified Complaint.

86.    Defendant Covino was responsible for the enactment, enforcement, and implementation of the First Facilities Use Policy, including enforcement and application against Plaintiffs.

87.    Defendant Chavez possessed "final responsibility in authorizing or denying the use of facilities by off-campus groups, and assessment of charges as appropriate," Ex. 1 § 6.2.3, including enforcement and application against Plaintiffs.

88.    The First Facilities Use Policy established the guidelines for determining the necessity for and level of security that may be required for any proposed event on campus.

89.    Defendants Covino, Wada-McKee, Chavez, and Ortiz (sometimes collectively referred to herein as the "Administrator Defendants") are each delegated specific authority and responsibility for the administration, interpretation, and oversight of the First Facilities Use Policy, Ex. 1 § 6.2.3, including enforcement and application against Plaintiffs.

90.    The stated purpose of the First Facilities Use Policy was to "establish the policies and procedures governing the use of University facilities, equipment, and services." Ex. 1.

91.    The Facilities Use Policy provided that University facilities may be used for "[a]ctivities not directly related to the academic program, but sponsored by University recognized organizations and intended primarily for a campus audience." However, the "[t]ime, place, and manner of non-instructional events and activities shall be determined by the University in accordance with relevant statutes, policies, and procedures." Ex. 1 § 4.1.

92.    The Office of Public Affairs was required to "[r]eview requests for use of University facilities for non-instructional activities to determine suitability of the space requested and conformity of the proposed event with University policy." *Id.* § 6.3.2.

93.    The Department of Public Safety was required to "[p]rovide security, parking, and/or crowd control as needed upon receipt of Public Safety Work Request Form." The Department of Public Safety was further required to "[p]erform a risk

assessment of each event to determine appropriate staffing levels and assign personnel as required." *Id*. § 6.6.

94.     In conducting the risk assessment, the First Facilities Use Policy required the Department of Public Safety to "take into account the type of event, profile of attendees, historical, or any other relevant considerations." *Id*.

95.     Section 6.6.5 of the First Facilities Use Policy provided that the Department of Public Safety will:

> Determine types of security based on the type of event being held. Some events will require high level of security necessitating the presence of police officers, parking enforcement, and student assistants.

6.6.5.1. General Staffing Guidelines will involve:

| Event Type | Police Officers | Parking Officers | Student Assistants |
|---|---|---|---|
| Student dances | 1-2 | 0-3 | 5-6 |
| Athletic events | 0-4 | 0-3 | 0-10 |
| Concerts | 4-All | 1-3 | All |
| Performing Arts | 0-4 | 0-3 | 0-10 |
| *Controversial Activity* | *3-All* | *0-2* | *2-5* |
| Student Activities | 4-All | 0-3 | 4-6 |

*Id*. at § 6.6.5 (emphasis added).

96.     Appendix 8.1 to the First Facilities Use Policy is entitled "Rates and Charges Schedule for University Facilities, Equipment and Services (Subject to Change)." However, the Schedule does not include the rates and charges for security. A copy of the Rates and Charges Schedule is attached as Exhibit 2 to this Second Amended Verified Complaint.

97.     The Student Organization Handbook contains a section entitled "Security at Campus Events" (the "Security at Campus Events Policy") (the First Facilities Use Policy and Security at Campus Events Policy are collectively referred

to hereafter as the "First Security Fees Policy").  The Security at Campus Events policy provides that "Student Organizations may request the Department of Public Safety to provide security at their on campus events."  If a request is made, the Department "will provide services for a fee."  A copy of the Security at Campus Events Policy is attached as Exhibit 3 to this Second Amended Verified Complaint.

98.     If a Student Organization expects attendance at its event to exceed seventy-five people, the organization "must notify the Department of Public Safety in order to determine security needs prior to the event, if any."  *Id.*

99.     The estimated security fees are: (1) University Police Officers - $85 per hour, per officer; (2) Peer Officers - $11 per hour, per officer; (3) Parking Officers - $45 per hour, per officer; and (4) Administration Fee – 7.5% of total security fees or $50 (whichever is greater).  *Id.*

100.   The First Security Fees Policy specifically authorized the University to assess a fee on students or a student organization only when the student or student organization requests that the University provide security for their event.

101.   The First Security Fees Policy did not contain any criteria to guide the Administrator Defendants or other University administrators in determining whether to assess security fees on students or student groups in exchange for providing security for their events.

102.   The First Security Fees Policy, by specifying a particular fee for "controversial" events, allowed the University to discriminate against Plaintiffs and other students at the University based upon the content and viewpoint of their speech.

103.   The First Security Fees Policy required the Administrator Defendants to consider the content and viewpoint being expressed by a student or student organization to determine whether to impose security fees upon the student or student organization.

104.    The First Security Fees Policy authorized the Administrator Defendants to impose security fees upon YAF and other student organizations if the Administrator Defendants determined that the event was going to involve "controversial activity."

105.    The First Security Fees Policy did not provide any objective, non-content-based and non-viewpoint-based criteria for Administrator Defendants to use when deciding whether to impose security fees on YAF and other student organizations.

106.    The First Security Fees Policy did not limit the discretion of Administrator Defendants when deciding whether to impose security fees upon YAF and other student organizations.

**2.    Administrator Defendants' Second Security Fees Policy**

107.    After the Complaint was filed, the Administrator Defendants amended the Security Fees Policy twice.

108.    On June 29, 2016, the Administrator Defendants created the Second Security Fees Policy by revising § 6.6.5 of the Facilities Use Policy (the "Revised Facilities Use Policy"). A copy of the Revised Facilities Use Policy is attached as Exhibit 4 to this Second Amended Verified Complaint.

109.    The Administrator Defendants removed the First Security Fee Policy's reference to "controversial activity" in § 6.6.5.

110.    The Revised Facilities Use Policy deleted § 6.6.5, including the reference to "controversial activity" in the general staffing guidelines, and replaced it with a requirement that the Department of Public Safety: "Determine the type of security necessary based on the public safety needs of the event being held. Each event will be considered on a case-by-case basis to determine appropriate staffing." Ex. 4 at § 6.7.5.

111.   Plaintiffs were unaware of the Second Security Fees Policy until the Administrator Defendants filed their Motion to Dismiss (ECF No. 43) on July 14, 2016 which included a copy of the Revised Facilities Use Policy.

112.   The Second Security Fees Policy did not specifically authorize the University to impose security fees on students or student groups in exchange for providing security for their events.

113.   The Second Security Fees Policy did not contain a uniform standard that University administrators must use when applying the policy. Instead, the policy required the University administrators to consider each event on a case-by-case subjective basis.

114.   The Second Security Fees Policy did not include any objective, non-content-based, non-viewpoint-based criteria for the Administrator Defendants or other University administrators to use when deciding whether to impose security fees on YAF and other students and student organizations.

115.   The Second Security Fees Policy did not include any objective, non-content-based, non-viewpoint-based criteria for the Administrator Defendants or other University administrators to use when deciding how much security to require or the amount of security fees to impose on YAF and other students and student organizations.

116.   The Second Security Fees Policy allowed the Administrator Defendants or other University administrators to impose security fees on YAF and other students groups based upon the content or viewpoint of their speech, including the controversial nature of the speech or the potential reaction to the speech.

117.   On August 15, 2016, Plaintiffs filed their Response to the Administrator Defendants' Motion to Dismiss in which Plaintiffs argued that the Second Security Fees Policy fails to remedy the constitutional defects of the policy. *See* Pls.' Resp. to Mot. To Dismiss 6-10, (ECF No. 53).

### 3.    Administrator Defendants' Third Security Fees Policy

118.    After Plaintiffs filed their Response to the Administrator Defendants' Motion to Dismiss, the Administrator Defendants revised the Security Fees Policy once again.

119.    On August 26, 2016, the Administrator Defendants created the Third Security Fees Policy by amending Administrative Policy P007 (the "Free Expression Policy") to include the following provision:

"The University's Department of Public Safety will determine the type of security necessary based on the public safety needs of the event being held. Each event will be considered on a case-by-case basis to determine appropriate staffing. The University will assess security needs, and assess fees for security provided by the University, based only on factors that are not related to viewpoint, such as the size of the crowd expected at an event, the location of the event, the time of day when the event is held, and the availability of parking in proximity to the event."

A copy of the Free Expression Policy is attached as Exhibit 5 to this Second Amended Verified Complaint.

120.    The Third Security Fees Policy grants the University unbridled discretion to discriminate against speech based upon its content and viewpoint.

121.    For example, the Third Security Fees Policy does not require the University to impose security fees on an event if it meets certain objective criteria, or not impose fees if it does not meet those specified criteria.  Instead, the policy grants University administrators the authority to assess fees in their sole discretion, using unspecified factors. Accordingly, even if two different events had the same size of crowd, were held at the same location, were held at the same time of day, and had the same parking needs, the policy authorizes University administrators to impose security fees on one event but not on the other event.

122.   The Third Security Fees Policy allows the Administrator Defendants or other University administrators to impose security fees on YAF and other students groups based upon the content and viewpoint of their speech, including the controversial nature of the speech or the potential reaction to the speech.

123.   The Third Security Fees Policy does not contain a uniform standard that University administrators must use when applying the policy. Instead, the policy requires the University administrators to consider each event on a case-by-case subjective basis.

124.   For example, the Third Security Fees Policy allows University officials to impose fees on a speaker who will be discussing racism but decline to impose fees on a speaker who will be discussing poverty, or to impose security fees on one speaker discussing poverty but not another because of their viewpoints.

125.   The Third Security Fees Policy does not contain an exclusive or exhaustive list of criteria that University officials may consider when determining whether to assess security fees on students and student groups. Instead, the policy provides that University officials may consider criteria "such as" the size of the crowd, location, time, and availability of parking when determining whether to assess security fees on students and student groups.

126.   The policy's inclusion of the words "such as" prior to the list of criteria authorizes University officials to consider criteria other than the criteria listed in the policy.

127.   And the general "criteria" that are included are insufficient to remove any unbridled discretion.

128.   For example, the Third Security Fees Policy allows University officials to impose security fees based upon (i) whether students and faculty object to the speaker or content of the speech, (ii) whether that speaker has drawn protests in the past or at other universities, or (iii) whether University administrators disagree with the content or viewpoint of the speech.

129.    The Third Security Fees Policy allows University officials to assess fees on students and student groups based on listeners' reactions to the speech because it does not specify whether University administrators' estimates regarding the size of the crowd expected at an event should include the number of persons protesting--or even blockading--the event, or just those attending.

130.    For example, University officials may assess security fees on an event that is only attended by ten persons but that draws 100 protestors. By allowing the University to consider the presence of protestors, the policy authorizes University officials to consider the viewpoint of the speech and thus discriminate against and punish unpopular speech.

131.    The Third Security Fees Policy does not include any objective, non-content-based, non-viewpoint-based criteria for the Administrator Defendants or other University administrators to use when deciding how much security to require or the amount of security fees to impose on YAF and other students and student organizations.

132.    The Third Security Fees Policy does not identify the University official that is authorized to make the final decision whether to assess fees.

133.    The Third Security Fees Policy does not require University officials to provide written justification for their decision whether to assess security fees.

134.    The Third Security Fees Policy does not provide any appeals process for students to use if security fees are assessed.

135.    Students or student organizations, including YAF, that fail to pay the security fees imposed by Administrator Defendants will be unable to conduct their event on campus.

**II.    Defendants' Enforcement of Their Unconstitutional Policies**

> **A.    Administrator Defendants' Application of the Security Fees Policy**

136.    In January 2016, the Foundation partnered with Shapiro to host a nationwide speaking tour at college campuses to discuss free speech in higher education.  Declaration of Ben Shapiro, ¶ 3, attached as Exhibit 38 to this Second Amended Verified Complaint.[1]

137.    YAF contacted the Foundation and requested that CSU-LA be included as a stop on Shapiro's speaking tour.  Shapiro Decl. ¶ 4, at Ex. 38.

138.    The Foundation and Shapiro agreed to include CSU-LA in the speaking tour.  Shapiro Decl. ¶ 5, at Ex. 38.

139.    The event was entitled "When Diversity Becomes a Problem" and was tentatively scheduled for February 25, 2016 at 2:00 p.m. (the "Free Speech Event").  Shapiro Decl. ¶ 6, at Ex. 38.

140.    YAF filled out an Event Registration Form and submitted it to the Center for Student Involvement.  Declaration of Mark Kahanding, ¶ 6, attached as Exhibit 36 to this Second Amended Verified Complaint.

141.    The event form was approved by the University and returned to YAF.  Kahanding Decl. ¶ 7, at Ex. 36.

142.    YAF submitted a request to reserve the University Student Union Theatre.  The request was approved by the University.  Kahanding Decl. ¶ 8, at Ex. 36.

143.    YAF submitted a request to Associated Students, Inc. ("ASI") to fund a portion of the event.  Kahanding Decl. ¶ 9, at Ex. 36.

---

[1] Although all of the facts in this Complaint are verified, the Declarations of Patrick X. Coyle, Jr., Ben Shapiro, Mark Kahanding, and Olivia Karapanian, are also attached as a supplement to this verification to specify a person with personal knowledge of certain facts.

144.   ASI approved YAF's request to fund the Free Speech Event in the amount of $560.  Kahanding Decl. ¶ 10, at Ex. 36.

145.   In consideration for bringing Shapiro to CSU-LA, YAF agreed to pay a small portion of the honorarium while the Foundation agreed to pay the remaining costs. Declaration of Patrick X. Coyle, Jr., ¶ 7, attached as Exhibit 37 to this Second Amended Verified Complaint.

146.   The Foundation incurred a total of $18,367.93 in expenses to host the Free Speech Event, less the $560 reimbursement from YAF.  Coyle Decl. ¶ 8, at Ex. 37.

147.   Upon receiving ASI's funding approval, YAF created an event on Facebook and began promoting the Free Speech Event on its Facebook page. Kahanding Decl. ¶ 12, at Ex. 36.

148.   Students and faculty, including Defendant Weide, began posting angry and threatening comments on YAF's Facebook page.  A copy of some of the comments are attached as Exhibit 6 to this Second Amended Verified Complaint. Kahanding Decl. ¶ 13, at Ex. 36.

149.   Upon information and belief, prior to the date of the Free Speech Event, the Administrator Defendants were aware that Defendant Weide and other members of the faculty were posting angry and threatening comments on YAF's Facebook page and that they were encouraging other members of the faculty and students to do the same. *See*, Exhibit 35, at 3:48 – 4:22.

150.   Upon information and belief, the Administrator Defendants were actively monitoring the social media activity surrounding the Free Speech Event. *Id*.

151.   Upon information and belief, the Administrator Defendants did not take any action to stop Defendant Weide and other members of the faculty from posting such comments on YAF's Facebook page or from encouraging other faculty and students to do the same because they were acting pursuant to the Speech Suppression Policy.

152.   Upon information and belief, in the weeks leading up to the Free Speech Event, Defendant Abdullah and other members of the faculty met with University administrators to convince them to cancel the Free Speech Event because they disagreed with the content and viewpoint of Plaintiffs' speech. *See*, Exhibit 35, at 36:13 – 35:35.

153.   On February 18, 2016, the University issued a Public Safety Work Request requiring YAF to pay the University $621.50 to provide security for the Free Speech Event.  A copy of Public Safety Work Request (the "Work Request") is attached as Exhibit 7 to this Second Amended Verified Complaint.  Kahanding Decl. ¶ 14, at Ex. 36.

154.   The Work Request was prepared by Defendant Ortiz.  According to the Work Request, the Free Speech Event was scheduled from 2:00 P.M. to 4:00 P.M. and attendance was estimated to be 200 people.

155.   The Work Request included the following description of the event:

> Student organization Young Americans for Freedom will be hosting guest speaker Ben Shapiro.  Mr. Shapiro's topics and views are controversial therefore University Police will be assigned to this event.  Ben Shapiro will have his own security detail as well that must be sanctioned by the Chief of Police. Doors open at 1:30 PM and event starts at 2 PM.

Ex. 7.

156.   The Work Request requested nine University Police officers and three Student Assistants for a period of 4.5 hours to provide security for the Free Speech Event.  The description of the job was as follows: "Several University Police Officer [*sic*] will be utilized for this event.  3 Eagle Patrol personnel will be needed to mitigate the line and assist University Police.  Student organization will only be charged for 1 Police personnel." *Id.*

157.   The Work Request indicated that YAF would be charged a total of $621.50 which was itemized as follows: (1) 1 University Police Officer for 4.5 hours for a total of $382.50; (2) 3 Student Assistants for 4.5 hours for a total of $189.00; and (3) a $50 fee for Planning/Processing.  *Id.*

158.   The Administrator Defendants imposed the security fees upon YAF based on the hostility that students and faculty expressed towards the proposed Free Speech Event and the content and viewpoints that YAF intended to present during the event.

159.   On February 22, 2016, after YAF learned that the University was attempting to charge YAF a fee due to the alleged "controversial" nature of Shapiro's speech, YAF's counsel sent a letter to the University demanding that the University rescind the unconstitutional assessment of security fees on YAF.  A true and correct copy of the letter is attached as Exhibit 8 to this Second Amended Verified Complaint.

160.   On February 23, 2016, the University agreed to rescind the assessment of security fees on YAF because it said there was not enough time to research whether the charge was proper.  A true and correct copy of this e-mail from the University is attached as Exhibit 9 to the Complaint.

161.   Although the University has modified the Security Fees Policy twice since the Complaint was filed, the Third Security Fees Policy still grants unbridled discretion to University administrators and still allows the University to assess security fees on YAF based on the content and viewpoint of their speech.

162.   YAF is already planning several activities for the spring 2017 semester. For example, YAF is working on bringing Rachel Campos Duffy and Rick Santorum to speak on campus in the spring 2017 semester.  Ms. Duffy would be speaking on the issue of how Latino values are consistent with the values of the conservative political viewpoint. Mr. Santorum would be speaking on the issue of religious liberty.  Kahanding Decl. ¶ 21, at Ex. 36.

163.   The Administrator Defendants possess the authority to assess security fees on YAF pursuant to the Third Security Fees Policy and will assess security fees on YAF based on the "controversial" nature of the topics and because the Administrator Defendants disagree with the content and viewpoint of YAF's speech.

164.   YAF has modified, prohibited, and suppressed its speech because of the Third Security Fees Policy.  To avoid the assessment of a security fee under the Third Security Fees Policy, YAF has been forced to and is continuing to be forced to choose speakers that the Administrator Defendants or other members of the campus community would likely consider to be less controversial and thus would be less likely to impose a fee.  For example, YAF wanted to bring Ann Coulter to speak at CSU-LA in the Fall 2016 semester.  However, YAF declined to invite her to speak because the Administrator Defendants would require YAF to pay a security fee for such event because of the content and viewpoint of her speech.  Kahanding Decl. ¶ 22, at Ex. 36.

165.   The Third Security Fees Policy authorizes the Administrator Defendants to include the number of protestors within the calculation as to the size of the crowd expected at a particular event.

166.   Given the opposition to conservative viewpoints on campus, including by Defendants, if YAF submits a reservation request to use CSU-LA facilities for any future events that the campus community will consider to be more controversial than others, or whose content or viewpoint Defendants oppose, the Administrator Defendants will impose security fees based on the content or topic of the speech or based on the reaction to the speech by other students and faculty members.  Kahanding Decl. ¶ 23, at Ex. 36.

167.   YAF cannot afford to pay security fees for its future events.  Thus, if the Administrator Defendants assess a security fee on any future events, YAF will be unable to host such events on campus.  Kahanding Decl. ¶ 24, at Ex. 36.

168.   CSU-LA's Third Security Fees Policy and Administrator Defendants' enforcement of such policy against YAF burdens its freedom of speech.

**B.     Defendants' Enforcement of the Speech Suppression Policy Against Plaintiffs' Free Speech Event**

**1.     Defendants' Enforcement Actions Prior to the Free Speech Event**

169.   Pursuant to the Speech Suppression Policy, Defendant Abdullah was instrumental in organizing the blockade of the Free Speech Event because she disagreed with the content and viewpoint of Plaintiffs' speech. Kahanding Decl. ¶ 25, at Ex. 36.

170.   For at least a week prior to the event, Defendant Abdullah made numerous social media posts advertising a People Power Protest and encouraging people to show up at 1:00 p.m. to stop the Free Speech Event.   For example, Abdullah posted the following comment on Facebook in reference to the Free Speech Event: "I say this event is a problem…What we go'n do y'all?!?!"   Copies of a few social media posts are attached as Exhibit 10 to this Second Amended Verified Complaint. Kahanding Decl. ¶ 26, at Ex. 36.

171.   Upon information and belief, Defendant Abdullah also prepared flyers promoting a "Student Union Take-Over" beginning at 1:00 P.M. at the University Student Union Plaza in order to interfere with, block and shut down the event.   The poster encouraged faculty and staff to "Send Your Students."   A copy of the poster is attached as Exhibit 11 to this Second Amended Verified Complaint.

172.   The flyers were shared on social media by Defendant Abdullah prior to the Free Speech Event and posted throughout the campus on the day of the event.

173.   On the day of the Free Speech Event, Defendant Abdullah posted the following on Facebook:

1  WE NEED ALL HANDS ON DECK THURSDAY 2/25 1PM AT CAL
2  STATE LA STUDENT UNION FOR A PEOPLE POWER PROTEST
3  FOR FREE SPEECH, NOT HATE SPEECH.

4  The University President has reneged on his commitment to stand up
5  for people of color against **#HateSpeech**. He is permitting on campus
6  a right-wing extremist who is attempting to incite Black and
7  progressive faculty, students of color, **#BlackLivesMatter**, and
8  community organizers and whose followers have issued violent threats.

9  WE MUST NOT SUBMIT TO OPPRESSION. RISE UP!

10  That same day, Abdullah also posted this comment on Facebook: "Resistance means
11  refusing to submit to our oppression….very diff than simply reacting." A copy of
12  the Facebook posts is attached as Exhibit 12 to this Second Amended Verified
13  Complaint. Kahanding Decl. ¶ 27, at Ex. 36.

14  174.   Pursuant to the Speech Suppression Policy, Defendant Weide engaged
15  in various actions designed to discourage students' participation in the Free Speech
16  Event, to encourage interference with the event, and to interfere with the event
17  himself, thus suppressing and inhibiting Plaintiffs' speech because he disagreed with
18  the content and viewpoint of such speech.

19  175.   After YAF announced the Free Speech Event on its Facebook page,
20  Defendant Weide made multiple posts on YAF's Facebook page in which he called
21  YAF supporters "white supremacists" and compared them to Hitler. A copy of the
22  Facebook post is attached as Exhibit 13 to this Second Amended Verified
23  Complaint. Kahanding Decl. ¶ 29, at Ex. 36.

24  176.   Defendant Weide even challenged the YAF supporters to a fight: "FYI
25  tough guy provocateurs, we have open mat on campus in the gym in the USU
26  building at 1 pm Friday and Noon on Saturday if you want to show us your white
27  supremacy. Heads up though, I lift bro…" A copy of the Facebook post is attached

28

1    as Exhibit 14 to this Second Amended Verified Complaint.  Kahanding Decl. ¶ 30,

2    at Ex. 36.

3           177.    Defendant Weide followed that post with another post challenging the

4    YAF supporters to a fight: "Hey if you've always wanted to choke one of your anti-

5    fascist professors, this is your opportunity of a lifetime!  Don't pass it up…" Ex. 13.

6    Kahanding Decl. ¶ 31, at Ex. 36.

7           178.    In another post discussing his views on the YAF event, Defendant

8    Weide indicated that he was an anarchist.  *See* Ex. 6.  Kahanding Decl. ¶ 32, at Ex.

9    36.

10          179.    Approximately one week prior to the event, Amy Lutz, a Foundation

11   staff member, and a YAF student member were accosted by Defendant Weide on

12   campus while they were posting flyers on a bulletin board in the hallway of a

13   University building.   Declaration of Amy Lutz, ¶ 4, attached as Exhibit 39 to this

14   Second Amended Verified Complaint.

15          180.    Also in violation of their rights, Defendant Weide ordered Ms. Lutz to

16   stand still and began tearing down the flyers from the bulletin board and then he

17   called security.  Lutz Decl. ¶ 4, at Ex. 39.

18          181.    While they were waiting for security, Defendant Weide told Ms. Lutz

19   and the student that they could either leave or stay but if they left he would follow

20   them.  Lutz Decl. ¶ 5, at Ex. 39.

21          182.    Defendant Weide called Ms. Lutz and the student "fascists." He then

22   called a campus administrator and told her that Ms. Lutz and the student were

23   intimidating him.  Lutz Decl. ¶ 6, at Ex. 39.

24          183.    Defendant Weide was very angry and kept demanding that Ms. Lutz

25   provide him with her personal identification information.  Lutz Decl. ¶ 7, at Ex. 39.

26          184.    The University administrator asked Defendant Weide to calm down on

27   several occasions because he was becoming very angry and aggressive.  Lutz Decl.

28   ¶ 8, at Ex. 39.

185.   Campus security finally arrived and told Ms. Lutz and the student not to post flyers on the bulletin board.  Ms. Lutz and the student complied and were finally allowed to leave the building.  Lutz Decl. ¶ 9, at Ex. 39.

186.   The next day, Defendant Weide posted the following ominous message on his office door: "The best response to micro-aggression is macro-aggression."  A picture of the message is attached as Exhibit 15 to this Second Amended Verified Complaint.  Lutz Decl. ¶ 11, at Ex. 39.

187.   All of these actions were taken pursuant to the Speech Suppression Policy.

188.   On February 22, 2016, also pursuant to the Speech Suppression Policy, Defendant Covino cancelled the Free Speech Event.  Shapiro Decl. ¶ 7, at Ex. 38.

189.   Defendant Covino sent the following e-mail to Mark Kahanding, President of YAF, stating that the University was canceling the Free Speech Event:

> After careful consideration, I have decided that it will be best for our campus community if we reschedule Ben Shapiro's appearance for a later date, so that we can arrange for him to appear as part of a group of speakers with differing viewpoints on diversity.  Such an event will better represent our university's dedication to the free exchange of ideas and the value of considering multiple viewpoints.  We will be happy to work with Mr. Shapiro to schedule the more inclusive event that I have in mind.  I have informed the university staff involved in facilitating the February 25 event that it will be rescheduled and reconfigured for a later date.

A copy of the e-mail is attached as Exhibit 16 to this Second Amended Verified Complaint.  Kahanding Decl. ¶ 34, at Ex. 36.

190.   Given all that went into organizing the event, including the expense, Plaintiffs decided that they would not consent to reschedule the Free Speech Event

and they announced that they planned to proceed with the event as scheduled. In response, Defendant Covino issued a press release just hours before the event. A copy of the press release is attached as Exhibit 17 to this Second Amended Verified Complaint. Shapiro Decl. ¶¶ 8-9, at Ex. 38.

## 2.    Defendants' Enforcement Actions During the Free Speech Event.

191.    Pursuant to the Speech Suppression Policy, the Defendants refused to protect Plaintiffs' rights and made virtually no effort to ensure a climate of safety and security. Indeed, through this Policy, the Defendants deliberately fostered a climate of anger and fear to suppress and prohibit Plaintiffs' speech.

192.    Kahanding, Karapanian, and Amy Lutz ("Lutz"), Program Officer for the Foundation, arrived on campus around 7:00 a.m. on the day of the Free Speech Event. On their arrival, they noticed several individuals with sleeping bags camped out in front of the doors to the Student Union. Kahanding Decl. ¶ 37, at Ex. 36.

193.    Kahanding, Karapanian, and Lutz began posting flyers around the campus to promote the event. As they began posting flyers, they observed that the campus had already been blanketed with flyers urging students to participate in a "Power to the People Unity Rally" and "Take-Over" the Student Union to prevent Shapiro from being able to deliver his speech. The rally was scheduled to begin at 1:00 p.m. which is a half hour prior to the time the doors were going to open for Shapiro's speech. Kahanding Decl. ¶ 38, at Ex. 36.

194.    After posting flyers, Kahanding, Karapanian, Lutz, and other members of YAF began preparing for the Free Speech Event. Between 10:00 a.m. and 11:00 a.m., Kahanding noticed that there were a large number of protestors gathering both inside and outside the Student Union. Kahanding Decl. ¶ 39, at Ex. 36.

195.    Due to the large group of aggressive opponents of their free speech rights, Lutz and Kahanding became concerned that students and other individuals wishing to attend the Free Speech Event would have a difficult time getting in the

31

doors to hear Shapiro's speech and participate in the event.  Kahanding Decl. ¶ 40, at Ex. 36.

196.    Approximately two hours prior to the beginning of the Free Speech Event, the large group opposing the event began filling the lobby of the Student Union.  These protestors became blockaders, eventually linking arms in front of the doors and physically blocking access to the doors to the theater where the event was to be held.  Kahanding Decl. ¶ 41, at Ex. 36.

197.    Defendants Teixeira and Bettcher linked arms directly in front of the doors with the other blockaders and physically blocked access to the doors of the theater.

198.    Students and other individuals wishing to attend the Free Speech Event were lined up outside the Student Union and were attempting to enter the theater. However, they were unable to access the Free Speech Event because the blockaders physically prevented them from entering the theater.  Kahanding Decl. ¶ 42, at Ex. 36.

199.    Plaintiff Karapanian was one of the students that tried to enter the theater through both the front and back entrances, but when she tried to pass through the crowd of blockaders, they would not allow her to get anywhere near the door to the theater.  Declaration of Olivia Karapanian, ¶ 7, attached as Exhibit 18 to this Second Amended Verified Complaint.

200.    Pursuant to the Speech Suppression Policy, the Faculty Defendants actively participated in the blockade and physically prevented Karapanian, other students, and members of the public from attending the Free Speech Event through threats, intimidation, and coercion because they disagreed with the content and viewpoint of Plaintiffs' speech.

201.    Pursuant to the Speech Suppression Policy, Defendant Abdullah actively participated in the blockade and she, along with others, physically prevented Karapanian, other students, and members of the public from attending the Free

Speech Event through the use of physical force. *See*, Karapanian Decl. ¶ 14, at Ex. 18; Decl. of Bryan Araiza ¶ 9, attached as Exhibit 19 to this Second Amended Complaint; and Decl. of Andres Taborda ¶¶ 11 and 15, attached as Exhibit 20 to this Second Amended Verified Complaint (along with the video at Exhibit 30, Taborda – Clip 2).

202.   While participating in the blockade, Defendant Abdullah also engaged in other threatening and intimidating behavior to prevent Karapanian and others from attending the Free Speech event, such as loudly shouting, along with the others in the crowd, "Whose school? Our school!", "Racists go home!", and "Unity of the majority!".   Karapanian Decl. ¶ 14, attached as Ex. 18.

203.   Defendant Abdullah approached a minority student that was holding a sign promoting free speech. She attempted to take the poster from the student and she said something to the effect of "You should be on our side." Taborda Decl. ¶ 9, at Ex. 20.

204.   Defendant Abdullah was providing encouragement and advice to the protestors. She appeared to be one of the leaders because many of the vocal leaders of the blockade would come to her periodically and talk with her. She appeared to be giving advice and encouragement to the student leaders of the protest. Taborda Decl. ¶ 10, at Ex. 20.

205.   Defendant Abdullah is pictured participating in the blockade in Exhibit 29, at pages 10-12. Defendant Abdullah is wearing a black shirt with green and yellow writing along with a multi-colored bracelet and her hair is in a bun. On page 10, Defendant Abdullah is facing the camera and is in the left half of the picture. On page 11, Defendant Abdullah is in the left side of the picture and she is holding her phone up to take a picture. On page 12, Defendant Abdullah is the person pictured in the furthest left of the picture directly above the female with the bright pink hair. A video showing Defendant Abdullah participating in the blockade is attached as Exhibit 30, at Taborda - Clip 2, 0:01-0:07. Defendant Abdullah is in the bottom left

of the video talking with a student at the front of the blockaders and standing directly in front of Andres Taborda. For identification purposes, a picture of Defendant Abdullah is attached to this Second Amended Verified Complaint as Exhibit 21.

206. Pursuant to the Speech Suppression Policy, Defendant Weide actively participated in the blockade and he, along with others, physically prevented Karapanian, other students, and members of the public from attending the Free Speech Event through the use of physical force. *See*, Karapanian Decl. ¶ 18, at Ex. 18; and Araiza Decl. ¶ 10, at Ex. 19.

207. While participating in the blockade, Defendant Weide also engaged in other threatening and intimidating behavior to prevent Karapanian and others from attending the Free Speech Event, such as loudly shouting, along with the others in the crowd, "Whose school? Our school!", "Racists go home!", and "Unity of the majority!". Karapanian Decl. ¶ 18, at Ex. 18.

208. A picture of Defendant Weide participating in the blockade is attached to this Second Amended Verified Complaint as Exhibit 22. Defendant Weide is in the far left of the picture facing the camera. He is wearing a black shirt, has black hair, a mustache, and sunglasses on the top of his head. The photograph was taken from a video posted on Defendant Abdullah's Instagram page. For identification purposes, a picture of Defendant Weide is attached to this Second Amended Verified Complaint as Exhibit 23.

209. Pursuant to the Speech Suppression Policy, Defendant Bettcher actively participated in the blockade and she, along with others, physically prevented Karapanian, Ben Hobbins, Ashley-Anne Hobbins, Andres Taborda, other students, and members of the public from attending the Free Speech Event through the use of physical force. *See*, Karapanian Decl. ¶ 16, at Ex. 18; Araiza Decl. ¶ 8, at Ex. 19; Taborda Decl. ¶¶ 12 and 14, at Ex. 20 (along with the video at Exhibit 30, Taborda – Clip 1); Decl. of Ben Hobbins ¶¶ 8 and 9, attached as Exhibit 24 to this Second Amended Verified Complaint (along with the video at Exhibit 30, Hobbins video);

and Decl. of Ashley-Anne Hobbins ¶ 7, attached as Exhibit 25 to this Second Amended Verified Complaint.

210.   While participating in the blockade, Defendant Bettcher also engaged in other threatening and intimidating behavior to prevent Karapanian and others from attending the Free Speech event, such as loudly shouting, along with the others in the crowd, "Whose school? Our school!", "Racists go home!", and "Unity of the majority!".   Karapanian Decl. ¶ 16, at Ex. 18.

211.   Defendant Bettcher stood directly in front of the doors to the Theater and linked arms with others, including Defendant Teixeira, to physically block people from attending the event.  *Id*.

212.   Defendant Bettcher can be seen participating in physically blocking access to the Free Speech Event in the following videos: (1) Exhibit 30, Clip 1, 0:01-1:11; (2) Exhibit 30, Clip 2, 0:40-0:55; (3) Exhibit 30, Clip 3, 1:20-1:29; (4) Exhibit 30, Clip 7, 0:52-2:00, 2:30-4:10, 5:50-6:00, and 6:40-8:00; (5) Exhibit 30, at Taborda - Clip 1, 0:01-0:08; and (6) Exhibit 30, at Hobbins video, 0:01-0:03, 0:09-0:10, and 1:25-1:50.  Defendant Bettcher has long blonde hair, black glasses, and is wearing a light green shirt. For identification purposes, a picture of Defendant Bettcher is attached hereto as Exhibit 26.

213.   Pursuant to the Speech Suppression Policy, Defendant Teixeira actively participated in the blockade and he, along with others, physically prevented Karapanian, Ben Hobbins, Ashley-Anne Hobbins, Andres Taborda, other students, and members of the public from attending the Free Speech Event through the use of physical force. *See*, Karapanian Decl. ¶ 16, at Ex. 18; Araiza Decl. ¶ 8, at Ex. 19; Taborda Decl. ¶¶ 12 and 14, at Ex. 20 (along with the video at Exhibit 30, Taborda – Clip 1); B. Hobbins Decl. ¶¶ 8 and 9, at Ex. 24 (along with the video at Exhibit 30, Hobbins video); and A. Hobbins Decl. ¶ 7, at Ex. 25.

214.   While participating in the blockade, Defendant Teixeira also engaged in other threatening and intimidating behavior to prevent Karapanian and others

from attending the Free Speech event, such as loudly shouting, along with the others in the crowd, "Whose school? Our school!", "Racists go home!", and "Unity of the majority!". Karapanian Decl. ¶ 17, at Ex. 18.

215. Defendant Teixeira stood directly in front of the doors to the Theater and linked arms with others, including Defendant Bettcher, to physically block people from attending the event. *See, e.g.*, Ex. 30, at Hobbins video.

216. Defendant Teixeira can be seen participating in physically blocking access to the Free Speech Event in the following videos: (1) Exhibit 30, Clip 1, 0:01-1:11; (2) Exhibit 30, Clip 3, 1:20-1:29; (3) Exhibit 30, Clip 7, 0:52-2:00, 2:30-4:10, 5:50-6:00, and 6:40-8:00; (4) Exhibit 30, at Taborda - Clip 1, 0:01-0:08; and (5) Exhibit 30, at Hobbins video, 0:01-0:03, 0:09-0:10, and 1:25-1:50. Defendant Teixeira is wearing glasses and a blue shirt and he has a thin goatee down the middle of his chin. For identification purposes, a picture of Defendant Teixeira is attached to this Second Amended Verified Complaint as Exhibit 27.

217. Pursuant to the Speech Suppression Policy, Defendant Borjon actively participated in the blockade and she, along with others, physically prevented Karapanian, other students, and members of the public from attending the Free Speech Event through the use of physical force. *See*, Karapanian Decl. ¶ 15, at Ex. 18; and Araiza Decl. ¶ 10, at Ex. 19.

218. While participating in the blockade, Defendant Borjon also engaged in other threatening and intimidating behavior to prevent Karapanian and others from attending the Free Speech event, such as loudly shouting, along with the others in the crowd, "Whose school? Our school!", "Racists go home!", and "Unity of the majority!". Karapanian Decl. ¶ 15, at Ex. 18.

219. Defendant Borjon can be seen being interviewed at the blockade in Exhibit 30, Clip 6, 2:15-3:35. For identification purposes, a picture of Defendant Borjon is attached hereto as Exhibit 28.

220.   After the Free Speech Event, Karapanian reviewed photographs of the blockaders' activities during Shapiro's lecture, which Kahanding obtained from videos Defendant Abdullah posted on the internet.[2]  These pictures represent a true, fair, and accurate description of what occurred outside Mr. Shapiro's lecture.  True, accurate, complete, and unedited copies of these pictures are attached as Exhibit 29 to this Second Amended Verified Complaint.  Karapanian Decl. ¶ 31, at Ex. 18.

221.   After the Free Speech Event, Plaintiff Karapanian reviewed videos of the blockaders' activities during the event that were publicly posted on the internet. The videos contained in clips 1, 2, 3, 4, 6, and 7 represent a true, fair, and accurate description of what occurred outside Mr. Shapiro's lecture.   True, accurate, complete, and unedited copies of these videos are attached as Exhibit 30 to this Second Amended Verified Complaint.  Karapanian Decl. ¶ 32, at Ex. 18.

---

[2] The original videos can be viewed at the following websites:

| Clip # | Website |
|---|---|
| Clip 1 | https://www.youtube.com/watch?v=tKsX7AFgU98&nohtml5=False |
| Clip 2 | https://www.youtube.com/watch?v=4c5YHIdoDWQ&nohtml5=False |
| Clip 3 | https://www.youtube.com/watch?v=NRVe6UCmq2I&nohtml5=False |
| Clip 4 | https://www.youtube.com/watch?v=kRLYmUhPfW0&feature=youtu.be |
| Clip 5 | https://www.youtube.com/watch?v=8oWe_apAVNE&feature=youtu.be |
| Clip 6 | https://www.youtube.com/watch?v=9M1dZCuj8rI |
| Clip 7 | https://www.youtube.com/watch?v=CmdYPnePJMQ&nohtml5=False |

The only difference between clips 1–2 and the versions posted on-line is that the latter now display a "PM Beers" icon in the lower right corner of the screen, something that was added after Plaintiffs downloaded the video.

222.   Many University police officers were present at the Student Union at the time the blockaders began blocking access to the doors. Kahanding Decl. ¶ 43, at Ex. 36.

223.   Pursuant to the Speech Suppression Policy, the University police officers did not take any action to stop the blockaders from blocking access to the Free Speech Event or to otherwise assist interested individuals in gaining access to the event. *See, e.g.,* Ex. 30, clip 4 at 04:11 – 05:00.

224.   Pursuant to the Speech Suppression Policy, Defendants Covino, Wada-McKee, and Chavez instructed University Police Chief Rick Wall to not move the blockaders away from the Free Speech Event.

225.   When Karapanian and other YAF members realized that students were unable to access the Free Speech Event through the front entrance in the lobby of the Student Union and that the University police were not going to take any action to allow access to the event, YAF began searching for alternative ways to assist students in gaining access to the event. Kahanding Decl. ¶ 45, at Ex. 36.

226.   YAF learned that there was a back door to the Student Union which allowed access to the theater. Kahanding Decl. ¶ 46, at Ex. 36.

227.   Karapanian and other YAF members began discreetly informing students and escorting them to the back entrance.  However, the blockaders soon learned that students were using the back door to gain entrance to the Free Speech Event.  Many blockaders then moved to the back entrance, stood in front of the door, and blocked access to the back doors of the Student Union. *See*, Ex. 30, at Clip 4. Attached as Exhibit 31 to this Second Amended Verified Complaint is a picture that is a true, fair, and accurate depiction of the blockaders at the back door of the Student Union.  Kahanding Decl. ¶ 47, at Ex. 36.

228.   Karapanian attempted to enter the back door to attend the Free Speech Event, but the blockaders surrounded her, prevented her from going in the door, and began verbally and physically assaulting her. Karapanian Decl. ¶ 25, at Ex. 18.

229.   The University police officers, pursuant to the enforcement of the Speech Suppression Policy through the orders of Defendants Covino, Wada-McKee, and Chavez, did not take any action to stop the blockaders from verbally and physically assaulting Karapanian or blocking the back doors of the Student Union. Karapanian Decl. ¶ 26, at Ex. 18.

230.   At this point, the blockaders were blocking access to the only two entrances to the theater where the Free Speech Event was to be held.  No one was able to get into or out of the theater.  Kahanding Decl. ¶ 48, at Ex. 36.

231.   The theater has a capacity of 200 people and it was approximately half-full at the time the entrances to both doors were blocked. Kahanding Decl. ¶ 49, at Ex. 36.

232.   The theater would have been filled to capacity and students and others would have been able to attend the Free Speech Event if Defendants had not enforced the Speech Suppression Policy against Plaintiffs.  Kahanding Decl. ¶ 50, at Ex. 36.

233.   Karapanian and more than 100 other students and community members were outside wanting to attend the Free Speech Event but were unable to do so because the blockaders, which include Defendants as described herein, were blocking access to the doors.

234.   As a result, Karapanian was unable to attend the Free Speech Event, which she had helped organize and prepare for as a member of YAF. Although she was unable to attend, Karapanian was forced to remain on campus because her purse containing her car keys and other possessions were in the Theater.  Karapanian Decl. ¶ 27, at Ex. 18.

235.   Karapanian informed the University police that she needed to get into the Theater to obtain her belongings but the police ignored her requests for assistance pursuant to Defendants Covino's, Wada-McKee's, and Chavez's enforcement of the Speech Suppression Policy and instructions to not interfere with the blockaders.

236.   Shapiro was scheduled to begin his speech at 2:00 p.m.  As a result of the blockaders denying access to the Free Speech Event, YAF, the Foundation and Shapiro delayed the start of the speech in an effort to allow more students to attend the event.  Kahanding Decl. ¶ 52, at Ex. 36.

237.   The beginning of the Free Speech Event was delayed for approximately ten to fifteen minutes.  Even though the theater was only half-full, Shapiro decided to proceed with his speech because it became clear that the Defendants were not going to allow access to the Theater.  Kahanding Decl. ¶ 53, at Ex. 36.

238.   During Shapiro's speech, one of the blockaders pulled the fire alarm in the Student Union in an attempt to further disrupt and interfere with his speech. Shapiro was forced to shout over the fire alarm for approximately two minutes so that he could convey his message to the listeners.

239.   Upon the conclusion of his speech, the University police officers advised Shapiro that the students should not attempt to leave the theater because the crowds were blocking both exits and the blockaders may cause harm to the attendees.

240.   The students voiced their desire to leave the theater but the University police advised that the students' lives would be in danger if they left the theater and that they could not guarantee the students' safety.

241.   Pursuant to the Speech Suppression Policy and its enforcement, the officers did nothing to remove the blockaders in order to allow those attending the event to be able to leave.

242.   The safety of the students and other attendees would not have been threatened if the Defendants had not enforced the Speech Suppression Policy against the Plaintiffs.

243.   The University police then escorted Shapiro through a secret exit while all of the attendees were forced to remain in the theater.

244.   Due to the blockaders blocking the only publicly available exits and the University's unwillingness to remove them, the attendees, including Kahanding,

were unlawfully forced to remain in the theater against their will for approximately 15 to 20 minutes after the Free Speech Event ended. Kahanding Decl. ¶ 57, at Ex. 36.

245.   Pursuant to the Speech Suppression Policy, the Faculty Defendants organized, promoted, attended, and participated in blocking access to the Free Speech Event because the Faculty Defendants disagreed with the content and viewpoint of Plaintiffs' speech.

246.   In addition to violating the constitutional rights of the Plaintiffs, the Faculty Defendants' attendance and participation in the blockade violated the following California criminal laws: (1) California Penal Code § 403 – disturbing a lawful meeting or assembly; (2) California Penal Code § 404 – participation in a criminal riot; and (3) California Penal Code § 407 – participation in an unlawful assembly.

247.   Pursuant to the Speech Suppression Policy, Defendants Covino, Wada-McKee, and Chavez instructed University police officers not to take any action to remove the blockaders from blocking access to the doors or to otherwise assist any individuals in gaining access to attend the Free Speech Event.

248.   Pursuant to the Speech Suppression Policy, the Defendants allowed the blockaders to block access to the Free Speech Event because the Defendants disagreed with the content and viewpoint of Shapiro's speech.

249.   Pursuant to the Speech Suppression Policy, the Defendants intentionally and deliberately allowed the blockaders to act as a "heckler's veto" to suppress and silence Plaintiffs' free speech rights by blocking access to the doors to the Theater.

250.   The Defendants violated Plaintiffs' freedom of speech through their enforcement of the Speech Suppression Policy because Plaintiffs were unable to convey their message to students and members of the public that were prevented from attending the Free Speech Event.

251.   The Defendants' enforcement of the Speech Suppression Policy violated Plaintiff Shapiro's freedom of speech because Shapiro was forced to speak to a half-full theater and was unable to convey his message to all of the intended audience.

252.   The Defendants' enforcement of the Speech Suppression Policy violated Plaintiff YAF's freedom of speech because YAF was unable to convey its intended message to all of the intended audience.

253.   The Defendants' enforcement of the Speech Suppression Policy violated Plaintiff Foundation's freedom of speech because the Foundation was unable to convey its intended message to all of the intended audience.

254.   The Defendants' enforcement of the Speech Suppression Policy violated Plaintiff Kahanding's freedom of speech because Kahanding was unable to convey his intended message to all of the intended audience.

255.   The Defendants' enforcement of the Speech Suppression Policy violated Plaintiff Karapanian's freedom of speech because she was unable to attend the Free Speech Event and, as a member of YAF, was unable to convey her message to all of the intended audience.

### 3.   Defendants' Enforcement of the Speech Suppression Policy After the Free Speech Event

256.   After the Free Speech Event, Defendants Borjon and Abdullah celebrated their "victory" in interfering with and shutting down the Free Speech Event and infringing upon Plaintiffs' free speech rights. In a Facebook post the day after the event, Abdullah stated:

As I reflect on yesterday, I go through such a range of emotions…from anxiety, to anger, to sadness, to deep love. The presence of vocal, active, crazed, violent White supremacists on our campus demonstrates how deep the fear and hate is. The notion that they could be losing ground shakes them to

their core; it causes them to cuss, and spit, and push, and lie, and abuse young people who are awakening to their own power.

My heart tightened as I watched middle-aged White men violently attack young Black and Brown men and women, who have become my children. And I exhaled as I witnessed Spirit overtake their strong, Brown faces, and the crowd of nearly 1000 students chanted "No Violence." In the midst of it all, I looked to our elders whose presence reminded all of us that it is our duty to fight for freedom…always.

My Soul soared as the students moved quickly, forming teams, making plans, setting goals, and ultimately deciding to call for the campus president's resignation based on his endorsement of hate speech, his dishonesty, and his refusal to put the safety of the campus ahead of his personal and professional self interest (or seeming self interest). At nearly midnight they filed out of the Administration building to regroup for the next chapter of the struggle. We debriefed and clasped hands under the moonlight, around a tree, and chanted Assata.

As I wake this morning, I settle into a state of immense thanksgiving….that the world is moving, Spirit is overtaking us, the people are rising up, love is winning….even in the midst of intense struggle….beautiful struggle.

Defendant Weide was tagged in the post. A copy of the Facebook post is attached as Exhibit 32 to this Second Amended Verified Complaint. Kahanding Decl. ¶ 59, at Ex. 36.

257. In a Facebook post the day after the event, Borjon praised and encouraged the blockaders for their lawless and violent behavior:

I am so proud of you Cal State LA black brown beautiful students who are so strong and so deep right now. You are getting a true education in the work

43

you are doing now putting history politics & social justice into practice beyond the classroom and into the core of your being because you know & please believe it is this love & spirit that will transform the world and you all bring that spirit of light life and love to us, to your mentors like Dr. Melina Abdullah.  You are the spirit of we who are mothers, we who give birth to life. Thank you all for your passion your commitment and your love—we are truly blessed as fight this beautiful struggle.

Abdullah responded to the post: "Much love Sis.  I so appreciate being in this struggle with you."  A copy of the Facebook post is attached as Exhibit 33 to this Second Amended Verified Complaint.  Kahanding Decl. ¶ 60, at Ex. 36.

258.   The day after the Defendants enforced the Speech Suppression Policy against the Plaintiffs and joined with the blockaders to block access to the Free Speech Event, Defendant Covino issued a message to the Campus Community.  A true and correct copy of the message is attached as Exhibit 34 to this Second Amended Verified Complaint.  Kahanding Decl. ¶ 61, at Ex. 36.

259.   Consistent with the Speech Suppression Policy's goal of shutting down and suppressing disfavored speech, Defendant Covino did not denounce the blockaders' unlawful behavior or violation of University policies. Instead, he praised them, indicating that the events of the past few days have been difficult but "have also been illustrations of our passionate devotion to social justice and the public good." *Id.*

260.   Defendant Covino reiterated that he was opposed to the Free Speech Event but that he "allowed" it to proceed "for two reasons: 1) as a public university, we prize freedom of speech, even when its content is disagreeable or offensive; 2) safety and security could have been at greater risk had we attempted to disallow his speech." *Id.*

261.   Defendant Covino stated that he is conducting a thorough review of this event including input "from a number of participants and observers." *Id.*   No

Defendant has ever contacted any of the Plaintiffs to obtain their perspective on the unlawful blockade that interfered with the Free Speech Event. Kahanding Decl. ¶ 65, at Ex. 36.

262.   On May 17, 2016, Defendant Covino held a public "healing event" in the University Student Union at the request of the organizers of the blockade.

263.   Defendant Abdullah attended the "healing event."

264.   The apparent purpose of the "healing event" was to allow the blockaders to discuss their objections to the University's handling of the Free Speech Event.

265.   Ana Martinez and Elizabeth Zey, student members of YAF, attended and video-recorded the event. A true, correct, complete, and unedited copy of the video of the event recorded by Ms. Martinez and Ms. Zey is attached as Exhibit 35 to this Second Amended Verified Complaint. *See*, Declaration of Ana Martinez attached as Exhibit 40 to this Second Amended Verified Complaint.

266.   Defendant Covino stated that when the Administrator Defendants learned that Plaintiffs were going to proceed with the Free Speech Event, they decided to "try to contain the event to make sure that it wasn't sort of open and out there" because they did not have any "legal recourse" to stop the Free Speech Event from happening. Ex. 35, at 6:20 – 07:37.

267.   Defendant Covino stated that the University had twenty eight police officers on campus on the day of the Free Speech Event whereas it normally only has four officers on duty at any given time. Ex. 35, at 31:22 - 31:40.

268.   Defendant Covino watched the livestream of the Free Speech Event. During the Free Speech Event, Defendant Covino was "monitoring" it and was "in close touch with all of the folks that were in the situation and we were having regular interchanges about what was happening." Ex. 35, at 08:08 – 08:11; 15:20 - 15:40.

269.   Defendant Covino stated that he ordered Police Chief Wall not to interfere with the blockaders at the Free Speech Event. Ex. 35, at 14:04 - 14:24.

270.   Defendant Covino's order pursuant to the Speech Suppression Policy prevented Plaintiffs from communicating their message to all interested listeners and prevented Karapanian, other students, and members of the public from attending and receiving information at the Free Speech Event.

271.   In response to the Free Speech Event, Defendant Covino stated that the Administrator Defendants and other University administrators are in the process of discussing revisions to University policies that would allow the University and the student body to block YAF from hosting future events on campus. Ex. 35, at 08:34 - 10:19; 27:12 - 28:23.

272.   Defendant Covino stated that he fully supports the efforts to revise University policies to allow the University and the students to block student groups like YAF from hosting certain events on campus. Defendant Covino encouraged the students to throw their support behind these revisions also. *Id.*

273.   The University's efforts to revise these University policies to allow the University and the student body to block YAF from hosting future events are being taken pursuant to the Speech Suppression Policy, to further its application in the future, and to put this previously unwritten Policy in writing.

274.   At the event, Defendant Abdullah admitted that "several of us who are on faculty and staff were there" at the blockade. Ex. 35, at 35:09 – 35:13.

275.   Defendant Abdullah also admitted that she believed the Free Speech Event was not speech protected by the First Amendment, that the University should not have allowed it to occur on the campus, and that she and other faculty and staff had conversations before the event with senior administrators at the University about why it should not be allowed on campus. Ex. 35, at 35:13 - 35:35.

276.   Through their enforcement of the Speech Suppression Policy, the Defendants have treated similarly situated individuals differently than Plaintiffs because Defendants have chosen not to enforce or apply the policy against other speakers that have been invited to speak on campus because Defendants do not

disagree with such speakers' views or they believe the speakers' views to be acceptable to the University community.

277.   For example, on May 25, 2016, Angela Davis gave a speech on the campus of CSU-LA which was entitled "Abolition, Resistance, and The Black Radical Tradition." Kahanding Decl. ¶ 70, at Ex. 36.

278.   Angela Davis is a former leader of the Communist Party USA and was closely associated with the Black Panther Party.  She was prosecuted for conspiracy, and later acquitted, for her alleged involvement in a 1970 armed take-over of a courtroom in Marin County, California which resulted in the murder of four people.

279.   Despite her controversial past and the controversial subject of her speech, the Defendants did not enforce the Speech Suppression Policy against Angela Davis.

280.   Defendant Covino did not cancel the speech and did not issue any press releases in which he stated that he disagreed with the content or viewpoint of Ms. Davis' speech. The Faculty Defendants did not make threatening comments to supporters of her speech or organize and participate in a blockade which prevented students and members of the public from attending Ms. Davis' speech. Defendants Covino, Wada-McKee, and Chavez did not order the police to allow blockaders to block access to the doors of Ms. Davis' speech. Kahanding Decl. ¶ 73, at Ex. 36.

281.   Plaintiffs YAF and Kahanding have modified, suppressed, and prohibited their speech because of the Speech Suppression Policy by choosing not to invite certain speakers to campus whose content and viewpoint the Defendants or other members of the campus community may consider to be more objectionable or controversial than other speakers.  For example, YAF wanted to bring Ann Coulter to speak at CSU-LA in the Fall 2016 semester. However, YAF declined to invite her to speak because the Defendants would enforce the Speech Suppression Policy against YAF due to the content and viewpoint of her speech. Kahanding Decl. ¶ 74, at Ex. 36.

**ALLEGATIONS OF LAW**

282.   At all times relevant to this Complaint, each and all of the acts and policies related to the Defendants alleged herein were attributed to the Defendants who acted under color of a statute, regulation, custom, or usage of the State of California.

283.   The Administrator Defendants knew or should have known that they were violating Plaintiff YAF's constitutional rights by enforcing the Security Fees Policy and assessing a security fee on YAF based upon the content and viewpoint to be expressed at the Free Speech Event.

284.   The Defendants knew or should have known that by enforcing the Speech Suppression Policy against Plaintiffs because the Defendants disagreed with the content and viewpoint of Plaintiffs' speech, the Defendants violated Plaintiffs' constitutional rights.

285.   YAF is suffering irreparable harm from the Administrator Defendants' Third Security Fees Policy and the Speech Suppression Policy.

286.   YAF has no adequate or speedy remedy at law to correct or redress the deprivation of its rights by the Defendants.

287.   Unless the Speech Suppression Policy and Third Security Fees Policy are enjoined, YAF will continue to suffer irreparable injury.

**FIRST CAUSE OF ACTION**

**AGAINST THE ADMINISTRATOR DEFENDANTS**

**<u>Violation of YAF's First Amendment Right</u>**

**<u>to Freedom of Speech – Security Fees Policy</u>**

**<u>(42 U.S.C. § 1983)</u>**

288.   YAF repeats and realleges each of the allegations contained in paragraphs 1–287 of this Complaint.

289.   Speech is entitled to comprehensive protection under the First Amendment.

290.   Political speech is fully protected by the First Amendment.

291.   The First Amendment rights of free speech extend to campuses of state universities.

292.   The sidewalks and open outdoor spaces of the University's campus are public forums for speech and expressive activities by students enrolled at CSU-LA.

293.   The Student Union Theater is a public forum for speech and expressive activities by students enrolled at CSU-LA.

294.   The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits content and viewpoint discrimination in the public forums for student speech and expression on the campus of a public university.

295.   A public university's ability to restrict speech—particularly student speech—in a public forum is limited.

296.   The First Amendment's Free Speech Clause prohibits censorship of political expression.

297.   Under the First Amendment's Free Speech Clause, a prior restraint on citizens' expression is presumptively unconstitutional, unless it (1) does not delegate overly broad licensing discretion to a government official, (2) contains only content and viewpoint neutral reasonable time, place, and manner restrictions, (3) is narrowly tailored to serve a significant governmental interest, and (4) leaves open ample alternative means for communication.

298.   The Administrator Defendants' First Security Fees Policy and their practice of charging student organizations a security fee for "controversial" events violates the First Amendment facially and as-applied because it is a prior restraint on speech in areas of campus that are traditional or designated public fora for CSU-LA students.

299.   Unbridled discretion to discriminate against speech based on its content or viewpoint violates the First Amendment regardless of whether that discretion has ever been unconstitutionally applied in practice.

300.   The Administrator Defendants' First Security Fees Policy and their practice of charging student organizations a security fee for "controversial" events or based on listeners' reactions violates the First Amendment facially and as-applied because they grant CSU-LA officials unbridled discretion to discriminate against speech based on its content or viewpoint.

301.   The Administrator Defendants violated YAF's First Amendment rights by assessing a security fee on YAF because the Administrator Defendants determined, with their unbridled discretion, that the Free Speech Event involved "controversial activity."

302.   The Administrator Defendants' First Security Fees Policy and associated practice of charging student organizations a security fee for "controversial" events required, on its face, content- and viewpoint-based discrimination.

303.   The Administrator Defendants engaged in content- and viewpoint-based discrimination by examining whether YAF's speech was "controversial" and how listeners might react to the speech.

304.   The Administrator Defendants' First Security Fees Policy and associated practice of charging student organizations a security fee for "controversial" events constituted an unconstitutional "time," "place," and "manner" restriction that violated YAF's right to freedom of speech and expression.

305.   The Third Security Fees Policy allows University officials to assess security fees on YAF based on the content and viewpoint of YAF's speech and based on how listeners might react to the speech.

306.   The Third Security Fees Policy does not contain a uniform standard that University administrators must use when applying the policy. Instead, the policy

requires the University administrators to consider each event on a case-by-case subjective basis.

307.   The Third Security Fees Policy does not include any objective, non-content-based, non-viewpoint-based criteria for the Administrator Defendants or other University administrators to use when deciding how much security to require or the amount of security fees to impose on YAF and other students and student organizations.

308.   The Third Security Fees Policy punishes disfavored speech because it allows University officials to assess security fees on YAF based on the number of protestors that may choose to attend and protest—or blockade—YAF's event.

309.   The Administrator Defendants' Third Security Fees Policy and associated practice does not provide the narrow, objective, or definite standards that are constitutionally required to limit the discretion of CSU-LA officials in deciding whether to assess security fees for a student organization event.

310.   The Administrator Defendants' Third Security Fees Policy and associated practice do not require CSU-LA officials to provide written justification for their decision to impose a security fee on student speech.

311.   The Administrator Defendants' Third Security Fees Policy and associated practice provide no appeal process that students may utilize when charged security fees for events.

312.   These grants of unbridled discretion to CSU-LA officials facially violate the First Amendment because they create a system in which speech is reviewed without constitutionally sufficient standards, thus giving students no way to prove that imposing a security fee for their event was based on unconstitutional considerations.

313.   Because the Administrator Defendants have failed to establish narrow, objective, and definite standards governing the imposition of security fees on student

51

organization events, there is a substantial risk that CSU-LA officials will engage in content and viewpoint discrimination when addressing those applications.

314.   The First Amendment's prohibition against content and viewpoint discrimination requires the Administrator Defendants to provide adequate safeguards to protect against the improper imposition of security fees based on the content or viewpoint of students' speech.

315.   The Administrator Defendants' Third Security Fees Policy and associated practice are neither reasonable nor valid time, place, and manner restrictions on speech because they are not content-neutral, they are not narrowly tailored to serve a significant government interest, and they do not leave open ample alternative channels of communication.

316.   While the Administrator Defendants have an interest in maintaining a safe campus, the assessment of security fees on "controversial" or disfavored speech but not other speech is not narrowly tailored to the Administrator Defendants' interest.

317.   If a fee is assessed under the Administrator Defendants' Third Security Fees Policy, YAF events have no alternative channels of communication because they must pay security fees everywhere on campus.

318.   The First Amendment's Freedom of Speech Clause prohibits a public university from imposing fees on student speech based on overbroad regulations.

319.   The Administrator Defendants' Third Security Fees Policy and associated practice are overbroad because they prohibit and restrict protected expression.

320.   The overbreadth of the Administrator Defendants' policies and related practice chill the speech of students not before the Court who seek to engage in private expression on campus.

321.   The Administrator Defendants' Third Security Fees Policy and associated practice chill, deter, and restrict YAF from freely expressing its political beliefs.

322.   YAF has modified, self-censored, and suppressed its speech because of the Third Security Fees Policy by choosing not to invite certain speakers to campus whose content and viewpoint the Administrator Defendants or other members of the campus community will consider to be more objectionable or controversial than other speakers.

323.   The Administrator Defendants' Third Security Fees Policy and associated practice violate YAF's right to free speech as guaranteed by the First Amendment to the United States Constitution.

324.   Pursuant to 42 U.S.C. §§ 1983 and 1988, YAF is entitled to a declaration that the Administrator Defendants' Third Security Fees Policy facially violates its First Amendment right to freedom of speech and an injunction against the Defendants' policy and actions.   Additionally, the Administrator Defendants violated YAF's First Amendment rights through their assessment of a security fee on YAF pursuant to the First Security Fees Policy and YAF is entitled to judgment for damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**

**AGAINST THE ADMINISTRATOR DEFENDANTS**

**<u>Violation of YAF's Fourteenth Amendment Right</u>**

**<u>to Due Process of Law – Security Fees Policy</u>**

**<u>(42 U.S.C. § 1983)</u>**

325.   YAF repeats and realleges each of the allegations contained in paragraphs 1–287 of this Complaint, as if set forth fully herein.

326.   The Fourteenth Amendment to the United States Constitution guarantees YAF the right to due process of law and prohibits the Administrator

53

Defendants from promulgating and employing vague standards that allow for content and viewpoint discrimination in the Administrator Defendants' handling of YAF's on-campus expression.

327.   The government may not regulate speech based on policies that permit arbitrary, discriminatory, and overzealous enforcement.

328.   The government may not regulate speech based on policies that cause persons of common intelligence to guess at their meaning and differ as to their application.

329.   The Administrator Defendants' First Security Fees Policy and associated practices contained no criteria to guide administrators when deciding whether to assess security fees on YAF and other student organizations.

330.   The Administrator Defendants' First Security Fees Policy was impermissibly vague and ambiguous and was incapable of providing meaningful guidance to the Administrator Defendants in determining whether to assess security fees on YAF and other student organizations.

331.   The Administrator Defendants violated YAF's Fourteenth Amendment rights by assessing a security fee on YAF pursuant to the First Security Fees Policy.

332.   Although the Administrator Defendants have revised the Third Security Fees Policy to include some criteria, the Administrator Defendants' Third Security Fees Policy and associated practice contain similar facially insufficient and vague criteria to guide administrators when deciding whether security is necessary at a student organization event.

333.   The Administrator Defendants' Third Security Fees Policy and associated practice are facially impermissibly vague and ambiguous and are thus incapable of providing meaningful guidance to the Administrator Defendants.

334.   The lack of criteria, factors, or standards in the Administrator Defendants' Third Security Fees Policy and associated practice renders the policy

and practice unconstitutionally vague facially and as-applied in violation of YAF's right to due process of law under the Fourteenth Amendment.

335.    YAF has modified, self-censored, and suppressed its speech because of the Third Security Fees Policy by choosing not to invite certain speakers to campus whose content and viewpoint the Administrator Defendants or other members of the campus community will consider to be more objectionable or controversial than other speakers.

336.    Because of the Administrator Defendants' actions, YAF has suffered, and continue to suffer, economic injury and irreparable harm. YAF is entitled to an award of monetary damages and equitable relief.

337.    Pursuant to 42 U.S.C. §§ 1983 and 1988, YAF is entitled to a declaration that the Administrator Defendants' Third Security Fees Policy facially and as-applied violates its Fourteenth Amendment right to due process of law and an injunction against the Administrator Defendants' policy and actions. Additionally, the Administrator Defendants violated YAF's Fourteenth Amendment rights through their assessment of a security fee on YAF pursuant to the First Security Fees Policy and YAF is entitled to judgment for damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including its reasonable attorneys' fees.

# THIRD CAUSE OF ACTION

## AGAINST ALL DEFENDANTS

### Violation of Plaintiffs' First Amendment Right
### to Freedom of Speech – The Free Speech Event
### (42 U.S.C. § 1983)[3]

338.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–287 of this Complaint, as if set forth fully herein.

339.   Based upon the allegations set forth above, the Defendants deprived Plaintiffs of their right to freedom of speech in violation of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

340.   At all relevant times, Plaintiffs were engaged in speech activity, specifically the Free Speech Event, that is fully protected by the First Amendment.

341.   The Defendants' actions injured Plaintiffs in a way likely to chill a person of ordinary firmness from further participation in that activity.

342.   Plaintiffs' constitutionally protected activity motivated the Defendants' actions. The Defendants acted with a retaliatory intent or motive.

343.   It was clearly established on February 25, 2016 that Defendants had a constitutional duty not to and ratify and effectuate a heckler's veto nor join a mob intent on suppressing protected speech.

344.   The Defendants were required to take reasonable action to protect persons exercising their constitutional rights, including Plaintiffs, from unlawful, disorderly and disruptive conduct. By failing to do so, the Defendants violated Plaintiffs' rights protected by the First Amendment.

---

[3] The Court dismissed this Cause of Action with prejudice in its Memorandum Order dated December 12, 2016 (ECF No. 87). However, Plaintiffs are retaining the Cause of Action in this Second Amended Verified Complaint for purposes of appeal.

345.   By effectuating a heckler's veto as set forth above, the Defendants' actions were content- and viewpoint-based in violation of the First Amendment.

346.   The Defendants' enforcement of a heckler's veto against Plaintiffs violated Plaintiffs' right to freedom of speech protected by the First Amendment.

347.   By ratifying and effectuating a heckler's veto and thus joining a mob intent on suppressing speech, the Defendants have effectively denied Plaintiffs the right to use a public forum for their expressive activity based on the content and viewpoint of Plaintiffs' message in violation of the First Amendment.

348.   By granting use of a public forum to people whose views the Defendants find acceptable, but denying use to those expressing less favored views, Defendants violated Plaintiffs' First Amendment right to freedom of speech.

349.   By refusing to comply with and enforce their policies and procedures, which require the Defendants to protect Plaintiffs' speech activity, based on the adverse reaction of others to the content and viewpoint of Plaintiffs' message, Defendants violated Plaintiffs' First Amendment right to freedom of speech.

350.   By refusing to protect Plaintiffs' speech activity and permitting protestors to engage in unlawful, disorderly, and disruptive conduct designed to silence Plaintiffs' message based on its content and viewpoint, the Defendants have violated Plaintiffs' First Amendment right to freedom of speech.

351.   By denying Plaintiffs access to a public forum to engage in their speech activities, which the Defendants disfavor, while permitting protestors, including the Faculty Defendants, to engage in unlawful, disorderly, and disruptive conduct designed to suppress Plaintiffs' message, the Defendants have effectively denied the use of this forum to those whose expressive activities the Defendants find unacceptable in violation of Plaintiffs' First Amendment right to freedom of speech.

352.   Defendant Abdullah violated Plaintiffs' First Amendment right to freedom of speech through her organization of and participation in the protest that

violated numerous University policies and state laws and unlawfully blocked access to the Free Speech Event.

353.   Defendant Weide violated Plaintiffs' First Amendment right to freedom of speech through his organization of and participation in the protest that violated numerous University policies and state laws and unlawfully blocked access to the Free Speech Event.

354.   Defendant Borjon violated Plaintiffs' First Amendment right to freedom of speech through her organization of and participation in the protest that violated numerous University policies and state laws and unlawfully blocked access to the Free Speech Event.

355.   Defendant Bettcher violated Plaintiffs' First Amendment right to freedom of speech through her organization of and participation in the protest that violated numerous University policies and state laws and unlawfully blocked access to the Free Speech Event.

356.   Defendant Teixeira violated Plaintiffs' First Amendment right to freedom of speech through his organization of and participation in the protest that violated numerous University policies and state laws and unlawfully blocked access to the Free Speech Event.

357.   By refusing to protect Plaintiff Karapanian's speech activity and permitting protestors to engage in unlawful, disorderly, and disruptive conduct which prevented Plaintiff Karapanian from being able to attend and receive information at the Free Speech Event based upon the content and viewpoint of the speech, the Defendants have violated Plaintiff Karapanian's First Amendment right to freedom of speech.

358.   Plaintiffs YAF and Kahanding will be hosting events on the CSU-LA campus this semester and in the coming semesters. There is a real and immediate threat that the Defendants will violate YAF's and Kahanding's First Amendment

rights through their violation of and refusal to enforce University policies and state and local laws due to the content and viewpoint of YAF's and Kahanding's speech.

359. As a direct and proximate result of the Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory relief and injunctive relief against the Defendants in their official capacity. Additionally, Plaintiffs are entitled to damages against Defendants in their individual capacity in an amount to be determined by the evidence and this Court, including, but not limited to the $17,807.93 in expenses incurred by the Foundation, and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**FOURTH CAUSE OF ACTION**

**AGAINST ALL DEFENDANTS**

**Violation of Plaintiffs' Fourteenth Amendment Right**

**to Equal Protection of the Law – The Free Speech Event**

**(42 U.S.C. § 1983)[4]**

360. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–287 of this Complaint, as if set forth fully herein.

361. The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the equal protection of the laws, which prohibits the Defendants from treating Plaintiffs differently than similarly situated persons.

362. The government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

---

[4] The Court dismissed this Cause of Action with prejudice against the Defendants in their personal capacity in its Memorandum Order dated December 12, 2016 (ECF No. 87). However, Plaintiffs are retaining the Cause of Action against Defendants in their personal capacity in this Second Amended Complaint for purposes of appeal.

363.   YAF, Karapanian, and Kahanding are similarly situated to other students at CSU-LA. Shapiro and the Foundation are similarly situated to all other non-students that are invited onto CSU-LA's campus.

364.   The Defendants violated the Equal Protection Clause of the Fourteenth Amendment through their enforcement of the Speech Suppression Policy against Plaintiffs because the Defendants disagreed with the content and viewpoint of Plaintiffs' speech.

365.   Defendants' enforcement of the Speech Suppression Policy prevented students and members of the public from attending the Free Speech Event and thus prevented Plaintiffs' from conveying their message to their intended audience.

366.   By ratifying and effectuating a heckler's veto through the enforcement of the Speech Suppression Policy and joining a blockade intent on suppressing speech, the Defendants denied Plaintiffs the right to use a public forum for their expressive activity based on the content and viewpoint of Plaintiffs' message in violation of the Equal Protection Clause of the Fourteenth Amendment.

367.   By granting use of a public forum to people whose views the Defendants find acceptable, but denying use to those expressing less favored views through the enforcement of the Speech Suppression Policy, the Defendants have violated the Equal Protection Clause of the Fourteenth Amendment.

368.   By refusing to enforce other policies and regulations pursuant to the Speech Suppression Policy, based on the adverse reaction of others to the content and viewpoint of Plaintiffs' message, the Defendants have deprived Plaintiffs of the equal protection of the law guaranteed by the Fourteenth Amendment.

369.   By refusing to protect Plaintiffs' speech activity pursuant to the Speech Suppression Policy and permitting and participating with blockaders to engage in unlawful, disorderly, and disruptive conduct designed to silence Plaintiffs' message based on its content and viewpoint, the Defendants imposed a heckler's veto and

deprived Plaintiffs of the equal protection of the law guaranteed by the Fourteenth Amendment.

370. By enforcing the Speech Suppression Policy and denying Plaintiffs access to a public forum to engage in their speech activities, which the Defendants disfavor, while permitting and participating with blockaders to engage in unlawful, disorderly, and disruptive conduct designed to suppress Plaintiffs' message, the Defendants denied the use of this forum to those whose expressive activities the Defendants find unacceptable in violation of the Equal Protection Clause of the Fourteenth Amendment.

371. Pursuant to the Speech Suppression Policy, the Defendants chose to selectively enforce the law and their own policies, practices, procedures, rules and regulations, and state and local laws out of an arbitrary desire to discriminate against Plaintiffs based on the content and viewpoint of Plaintiffs' speech in violation of the Equal Protection Clause of the Fourteenth Amendment.

372. The Defendants lack a rational or compelling state interest for such disparate treatment of Plaintiffs.

373. Defendant Covino violated Plaintiffs' Fourteenth Amendment right to equal protection of the laws by enacting and enforcing the Speech Suppression Policy against Plaintiffs, and by ratifying the other Defendants' enforcement of the policy, due to the content and viewpoint of Plaintiffs' speech.

374. Defendant Wada-McKee violated Plaintiffs' Fourteenth Amendment right to equal protection of the laws by enforcing the Speech Suppression Policy against Plaintiffs, and by ratifying the other Defendants' enforcement of the policy, due to the content and viewpoint of Plaintiffs' speech.

375. Defendant Chavez violated Plaintiffs' Fourteenth Amendment right to equal protection of the laws by enforcing the Speech Suppression Policy against Plaintiffs, and by ratifying the other Defendants' enforcement of the policy, due to the content and viewpoint of Plaintiffs' speech.

376.  Defendant Ortiz violated Plaintiffs' Fourteenth Amendment right to equal protection of the laws by enforcing the Speech Suppression Policy against Plaintiffs, and by ratifying the other Defendants' enforcement of the policy, due to the content and viewpoint of Plaintiffs' speech.

377.  Pursuant to the Speech Suppression Policy, Defendant Abdullah violated Plaintiffs' Fourteenth Amendment right to equal protection of the laws because she organized, and personally participated, in the blockade which prevented students and other members of the public from attending the Free Speech Event because she disagreed with the content and viewpoint of Plaintiffs' speech.

378.  Pursuant to the Speech Suppression Policy, Defendant Weide violated Plaintiffs' Fourteenth Amendment right to equal protection of the laws because he organized, and personally participated, in the blockade which prevented students and other members of the public from attending the Free Speech Event because he disagreed with the content and viewpoint of Plaintiffs' speech.

379.  Pursuant to the Speech Suppression Policy, Defendant Borjon violated Plaintiffs' Fourteenth Amendment right to equal protection of the laws because she organized, and personally participated, in the blockade which prevented students and other members of the public from attending the Free Speech Event because she disagreed with the content and viewpoint of Plaintiffs' speech.

380.  Pursuant to the Speech Suppression Policy, Defendant Bettcher violated Plaintiffs' Fourteenth Amendment right to equal protection of the laws because she organized, and personally participated, in the blockade which prevented students and other members of the public from attending the Free Speech Event because she disagreed with the content and viewpoint of Plaintiffs' speech.

381.  Pursuant to the Speech Suppression Policy, Defendant Teixeira violated Plaintiffs' Fourteenth Amendment right to equal protection of the laws because he organized, and personally participated, in the blockade which prevented

students and other members of the public from attending the Free Speech Event because he disagreed with the content and viewpoint of Plaintiffs' speech.

382. The Defendants have treated other similarly situated individuals differently than Plaintiffs because Defendants have chosen not to enforce or apply, and would not enforce or apply, the Speech Suppression Policy against other speakers that have been invited to speak on campus because Defendants do not disagree with such speakers' views or they believe such views to be acceptable to the University community.

383. Plaintiffs YAF and Kahanding will be hosting events on the CSU-LA campus this semester and in the coming semesters. There is a real and immediate threat that the Defendants will violate YAF's and Kahanding's Fourteenth Amendment rights through their enforcement of the Speech Suppression Policy due to the content and viewpoint of YAF's and Kahanding's speech.

384. Plaintiffs YAF and Kahanding have modified, prohibited, and suppressed their speech because of the Speech Suppression Policy by choosing not to invite certain speakers to campus whose content and viewpoint the Defendants or other members of the campus community would consider to be more objectionable or controversial than other speakers.

385. Because of the Defendants' actions, Plaintiffs have suffered, and continue to suffer irreparable harm. They are entitled to an award of monetary damages and equitable relief.

386. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that the Defendants violated their Fourteenth Amendment right to equal protection of the law and an injunction against the Defendants' Speech Suppression Policy and actions in their official capacity. Additionally, Plaintiffs are entitled to damages against Defendants in their individual capacity in an amount to be determined by the evidence and this Court, including, but not limited to the

$17,807.93 in expenses incurred by the Foundation, and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**FIFTH CAUSE OF ACTION**

**AGAINST THE FACULTY DEFENDANTS**

**<u>Violation of California's Bane Act</u>**

**<u>(Cal. Civ. Code § 52.1)</u>**

387.  Plaintiffs Shapiro, Kahanding, and Karapanian repeat and reallege each of the allegations contained in paragraphs 1–287 of this Complaint, as if set forth fully herein.

388.  Plaintiffs Shapiro, Kahanding, and Karapanian are pursuing this claim against the Faculty Defendants in their individual capacities.

389.  As set forth in the allegations above, Plaintiffs Shapiro, Kahanding, and Karapanian desired to communicate a message and convey information to students and others that were unable to attend the event.

390.  Through their participation in the interference with, and blockade of the event, in which they physically blocked access to the Free Speech Event, the Faculty Defendants prohibited Karapanian, other students, and members of the public from attending the Free Speech Event by threat, intimidation, or coercion.

391.  The Faculty Defendants' actions interfered with Plaintiffs Shapiro, Kahanding, and Karapanian's First and Fourteenth Amendment rights.

392.  Because of the Faculty Defendants' actions, Plaintiffs Shapiro, Kahanding, and Karapanian suffered, and continue to suffer, economic injury and irreparable harm. Shapiro, Kahanding, and Karapanian are entitled to a declaratory judgment and injunctive relief preventing the Faculty Defendants from interfering with their expressive activities in the future, an award of monetary damages, exemplary damages, civil penalty of $25,000 for each violation against each Faculty Defendant, and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

# SIXTH CAUSE OF ACTION
## AGAINST THE FACULTY DEFENDANTS
### Aiding and Abetting a Tort

393.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–287 of this Complaint, as if set forth fully herein.

394.   Plaintiffs are pursuing this claim against the Faculty Defendants in their individual capacities.

395.   As set forth in the allegations above, the Faculty Defendants organized, encouraged and participated in the interference with, and blockade of the event, with the intent to shut down the Free Speech Event.

396.   The blockaders' actions, including the Faculty Defendants, created both a public nuisance, and a private nuisance against Plaintiffs personally, by obstructing the public's and Plaintiffs' free use of property and unlawfully obstructing their free passage and use of the Theater which they had reserved and were entitled to use.

397.   The Faculty Defendants knew that blocking access to the Free Speech Event was a breach of duty that the blockaders had to the Plaintiffs.

398.   The Faculty Defendants provided substantial encouragement and assistance to the blockaders creating a public and private nuisance and in blocking access to the Free Speech Event which resulted in the violation of Plaintiffs' First Amendment rights.

399.   The Faculty Defendants actively participated in physically blocking access to the doors to the theater which prohibited Karapanian, other students, and members of the public from being able to attend the Free Speech Event and prevented Plaintiffs from communicating their message to all willing listeners.

400.   Because of the Faculty Defendants' unlawful actions, Plaintiffs have suffered, and continue to suffer harm. Plaintiffs are entitled to an award of monetary damages, including, but not limited to the $17,807.93 in expenses incurred by the

Foundation, and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

(A)   A declaratory judgment that the Administrator Defendants' Third Security Fees Policy and associated practices, facially violate Plaintiff YAF's rights under the First Amendment and Fourteenth Amendment;

(B)   A declaratory judgment that the Defendants' enforcement of the Speech Suppression Policy violated Plaintiffs' rights under the First and Fourteenth Amendments;

(C)   A declaratory judgment that the Faculty Defendants engaged in violations of the Bane Act against Plaintiffs Shapiro, Kahanding, and Karapanian.

(D)   A declaratory judgment that the Faculty Defendants aided and abetted a tort against Plaintiffs.

(E)   A preliminary and permanent injunction prohibiting the Administrator Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing the Third Security Fees Policy and associated practices challenged in this Complaint;

(F)   A preliminary and permanent injunction prohibiting the Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing the Speech Suppression Policy or otherwise disrupting or preventing Plaintiffs from engaging in lawful First Amendment activity at the University;

(G)   Compensatory and nominal damages for the Administrator Defendants' violation of YAF's First and Fourteenth Amendment rights through the assessment of the security fee pursuant to the First Security Fees Policy;

1

    (H)    Compensatory and nominal damages for the violation of Plaintiffs'

2

           First and Fourteenth Amendment rights;

3

    (I)    Compensatory damages and civil penalties for the violation of the Bane

4

           Act, and aiding and abetting a tort.

5

    (J)    Plaintiffs' reasonable attorneys' fees, costs, and other costs and

6

           disbursements in this action pursuant to 42 U.S.C. § 1988; and

7

    (K)    All other further relief to which Plaintiffs may be entitled.

8

9

Respectfully submitted this 20th day of January, 2017.

10

11

12

                     By: /s/ Tyson C. Langhofer

13

                          Tyson C. Langhofer*

14

                          AZ Bar No. 32589

15

                          Alliance Defending Freedom

16

                          15100 N. 90th Street

17

                          Scottsdale, Arizona 85260

18

                          (480) 444-0020

19

                          (480) 444-0021 Fax

20

                          tlanghofer@ADFlegal.org

21

                          David A. Cortman*

22

                          GA Bar No. 188810

23

                          Travis C. Barham*

24

                          GA Bar No. 753251

25

                          Alliance Defending Freedom

26

                          1000 Hurricane Shoals Rd. NE,

27

                          Suite D-1100

28

                          Lawrenceville, Georgia 30043

                          (770) 339–0774

                          (770) 339–6744 Fax

                          dcortman@ADFlegal.org

                          tbarham@ADFlegal.org

STEPHEN SHEPARD
CA Bar No. 153619
STEPHEN SHEPARD ATTORNEY AT LAW
7755 Center Avenue, Suite 1100
Huntington Beach, CA 92647
(714) 372-2228
(714) 903-3328 Fax
stephen@stephenshepard.com

*Attorneys for Plaintiffs*

*\*Admitted Pro Hac Vice*

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury of all matters so triable herein.

By: /s/ Tyson C. Langhofer
    TYSON C. LANGHOFER
    *Attorney for Plaintiffs*

## **VERIFICATION OF COMPLAINT**

1

2           I, Mark Kahanding, President of CSULA Young Americans for

3
Freedom, and a citizen of the United States and a resident of the State of California,
4

5    hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have

6    read the foregoing Second Amended Verified Complaint and the factual allegations

7
therein, and the facts as alleged are true and correct.
8

9           Executed this ____ day of January, 2017, at _____, California.

10

11

12

13                        Mark Kahanding, President

14                        CSULA Young Americans for Freedom

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION OF COMPLAINT**

I, Ben Shapiro, a citizen of the United States and a resident of the State of California, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Second Amended Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this _20_ day of January, 2017, at _Los Angeles_, California.


Ben Shapiro

**VERIFICATION OF COMPLAINT**

I, Patrick X. Coyle, Jr., Vice President of Young America's Foundation, and a citizen of the United States and a resident of the State of Virginia, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Second Amended Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this _20_ day of January, 2017, at _RESTON_, Virginia.


Patrick X. Coyle, Jr., Vice President
Young America's Foundation

71

1

**<u>VERIFICATION OF COMPLAINT</u>**

2

3        I, Mark Kahanding, a citizen of the United States and a resident of the State

4    of California, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746

5
     that I have read the foregoing Second Amended Verified Complaint and the factual
6

7    allegations therein, and the facts as alleged are true and correct.

8        Executed this ____ day of January, 2017, at _____, California.

9

10

11

12    _____

13                Mark Kahanding

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

72

## <u>VERIFICATION OF COMPLAINT</u>

I, Olivia Karapanian, a citizen of the United States and a resident of the State of California, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Second Amended Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this 20 day of January, 2017, at Los Angeles, California.

_____

Olivia Karapanian

73